1999 ME 60

**Robert BAGLEY et al.**

v.

**RAYMOND SCHOOL DEPARTMENT et al.**

Supreme Judicial Court of Maine.

Argued Nov. 2, 1998.

Decided April 23, 1999.

Linda C. Russell, Pettrucelli & Martin, LLP, Portland, Richard D. Komer (orally), Clint Bolick, William H. Mellor, Institute for Justice, Washington, DC, for plaintiffs.

Michael E. Saucier (orally), Thompson & Bowie, Portland, for Raymond School Department.

Andrew Ketterer, Attorney General, Peter J. Brann, State Solicitor, (orally), Augusta, for State defendants.

Donald F. Fontaine, Fontaine & Beal, P.A., Portland, Robert H. Chanin, John M. West, Page Kennedy, Bredhoff & Kaiser, PLLC, Washington, DC, for Timothy Humphrey et al.

Barbara G. Shaw, Marcus Grygiel & Clegg, P.A., Portland, Jeffrey A. Thaler, Bernstein, Shur, Sawyer & Nelson, Portland, for Maine Civil Liberites Union.

David G. Webbert, Johnson & Webbert, LLP, Augusta, Nathan Lewin, Richard W. Garnett, Miller, Cassidy, Larroca & Lewin, LLP, Washington, DC, Dennis Raps, National Jewish Commission on Law and Public Affairs, New York City, for amici curiae National Jewish Commission on Law and Public Affairs, Agudath Harabonim of the United States and Canada, Agudath Israel of America, Union of Orthodox Jewish Congregations of America, National Council of Young Israel, Rabbinical Alliance of America, Rabbinical Council of America, and Torah Umesorah— National Society of Hebrew Day Schools.

David A. Soley, Bernstein, Shur, Sawyer & Nelson, Portland, Steven K. Green, Ayesha N. Khan, Americans United for Separation of Church and State, Washington, DC, Jeffrey P. Sinesky, American Jewish Committee, New York City, Elizabeth J. Coleman, Steven M. Freeman, Lauren A. Levin, Anti–Defamation League of B'nai B'rith, New York City, Elliott M. Michberg, Judith E. Schaeffer, People for the American Way Foundation, Washington, DC, for amici curiae Americans United for Separation of Church and State, American Jewish Committee, Anti–Defamation League of B'nai B'rith, People for the American Way Foundation.

Michael H. Hill, Monaghan, Leahy, Hochadel & Libby, Portland, Kevin J. Hasson, Eric W. Treene, The Becket Fund for Religious Liberty, Washington, DC, Daniel E. Troy, Alex M. Azar II, Wiley, Rein & Fielding, Washington, DC, for amici curiae The Becket Fund for Religious Liberty.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and ALEXANDER, JJ.

SAUFLEY, J.

[¶ 1] We are called upon in this case to determine whether Maine's education tuition program, which explicitly excludes religious schools from receipt of state funds, violates any section of the United States or Maine Constitution. Because we conclude that it does not, we affirm the judgment of the Superior Court (Cumberland County, *Mills, J.*).

## I. BACKGROUND

[¶ 2] The material facts are undisputed. Maine requires all school districts to provide education to its residents from kindergarten through twelfth grade. *See* 20–A M.R.S.A. § 1001(8) (1993 & Supp.1998). Those districts that do not have their own schools must provide tuition to resident families for use in other schools, through the State's education tuition program. Under the tuition program, students of parents residing in a school district which neither maintains a secondary school nor contracts for secondary school privileges may attend a school approved for tuition purposes. *See* 20–A M.R.S.A. § 5204(4). The school district must pay tuition for these students in the amount of the legal tuition rate, defined in chapter 219. *See id.*

[¶ 3] The tuition rate for each school is approximately equal to the sum of the school's allowable expenditures, divided by the number of students at a particular school, adjusted by certain factors, and capped by a statewide average per public secondary student cost. *See* 20–A M.R.S.A. §§ 5805, 5806. School districts have the option either to

contract with one public school to take all of their students, pursuant to 20–A M.R.S.A. § 5204(3),[1] or pay tuition to public and approved private schools that accept students from that school district, pursuant to 20–A M.R.S.A. § 5204(4).[2] If the tuition program is used by a district, the district pays tuition directly to a public school or to a private school that has accepted the child, has been selected by the child's parents, and has been approved for tuition purposes, pursuant to 20–A M.R.S.A. § 2951. *See* 20–A M.R.S.A. § 5810.

[¶ 4] Approximately half of the school districts in Maine satisfy their obligation by operating public elementary and secondary schools. The other half satisfy their obligation either wholly through Maine's tuition program, or by operating some schools, usually elementary, and paying tuition for students to attend only those schools which the school districts do not operate. Nearly 14,000 students attend public and approved private schools under the tuition program and approximately $70 million in public funds is expended each year by the Maine Department of Education and local school districts on tuition for students to attend these schools.

[¶ 5] Prior to 1981, parents were able to select religious schools for participation in Maine's tuition program. In 1981, however, the Legislature made religious schools ineligible for the program by amending the statute to provide that "[a] private secondary school may be approved for the receipt of public funds for tuition purposes *only if it ... [i]s a nonsectarian school* in accordance with the First Amendment of the United States Constitution." 20–A M.R.S.A. § 2951(2) (emphasis added). The change was enacted in response to an Opinion of the

---

1. Section 5204(3) provides that "[s]tudents whose parents reside in a school administrative unit which contracts for school privileges under section 2701 may attend the contract school. The school administrative unit in which their parents reside shall pay the cost of the contract." 20–A M.R.S.A. § 5204(3).

2. Section 5204(4) provides that:
   [s]econdary students whose parents reside in a unit which neither maintains a secondary school nor contracts for secondary school priv-

ileges may attend a private school approved for tuition purposes, a public school in an adjoining unit which accepts tuition students, or a school approved for tuition purposes in another state or country upon permission of officials of the receiving school. The school administrative unit where the students' parents reside shall pay tuition in the amount up to the legal tuition rate as defined in Chapter 219.
20–A M.R.S.A. § 5204(4).

Attorney General. *See* Op. Me. Att'y Gen. 80–2. That Opinion, solicited by the Senate Chair of the Legislature's Committee on Education, concluded that the inclusion of religious schools in Maine's tuition program violated the Establishment Clause of the United States Constitution. *See id.* The State does not dispute that its only justification for excluding religious schools from the tuition program was compliance with the Establishment Clause.

[¶ 6] The Raymond School District ("Raymond") does not have a high school and instead provides secondary education through Maine's tuition program. Most of the high school students in Raymond attend public school in Windham, Westbrook, and Gray–New Gloucester. Some, however, attend approved private schools, including North Yarmouth Academy, Hebron Academy, and Waynflete School.[3]

[¶ 7] Five families from the town of Raymond, Robert and Cynthia Bagley; Gary and Cynthia St. Pierre; Dennis and Patricia Cole; Ricky and Mary Thornton; and Jack and Stacie Fitch (referred to herein collectively as the "parents"), enrolled their sons at Cheverus High School, an all-male, private Roman Catholic college preparatory school, located in Portland and operated by the Society of Jesus, a religious order. There is no dispute that Cheverus High School is a religious school, specifically, a "pervasively sectarian school," educating its students in both secular and religious subjects.[4] Each of the boys attended public elementary school and, through the tuition program, public middle schools. None of the children attended Catholic schools during their primary education.

[¶ 8] The Coles, Thorntons, and Fitchs are either not Catholics or are not practicing Catholics, and all sent their sons to Cheverus High School primarily for academic and so-cial reasons. The St. Pierres initially indicated that religion was a factor in their decision to send their son to Cheverus but later explained that the Cheverus hockey program and its academic reputation were the determining factors in their selection. The Bagleys, however, allege that religion was a principle motivation for choosing Cheverus, and Cynthia Bagley testified that it was her own "personal faith choice."

[¶ 9] After enrolling their sons, the parents requested that Raymond pay their sons' tuition at Cheverus. Raymond denied their requests, responding that "the Raymond School Department cannot pay tuition costs for sectarian schools," because they are not approved schools pursuant to 20–A M.R.S.A. § 2951(2). The parents filed this suit against Raymond, the Department of Education, and the Commissioner of Education, alleging that Raymond had violated their constitutional rights by refusing to pay tuition to the high school they selected for their sons.

[¶ 10] Without objection by the parents, a group of Raymond taxpayers and the Maine Civil Liberties Union intervened as defendants. Raymond then filed a motion to dismiss, which the trial court granted, holding that Raymond could not be liable under 42 U.S.C. § 1983 because the school district had no choice but to apply state law. Subsequently, the parents and the remaining defendants filed cross motions for summary judgment. After argument, the Superior Court granted the defendants' motions for summary judgment and denied the parents' motion for summary judgment, holding that 20–A M.R.S.A. § 2951(2) did not violate any of the constitutional provisions asserted by the parents.[5]

## II. ANALYTICAL FRAMEWORK

[¶ 11] This appeal presents a unique question, requiring that we articulate with preci-

---

3. In the 1997 school year, 31 of the Raymond middle school and high school aged children attended private schools.

4. *Cf. Columbia Union College v. Clarke,* 159 F.3d 151 (4th Cir.1998).

5. The parents state their claims under both the state and the federal civil rights acts. *See* 5 M.R.S.A. §§ 4681–4685 (Supp.1998); 42 U.S.C. § 1983 (1994). The Maine Civil Rights Act is inapplicable to the claims presented. It applies when there has been the use or threat of "physical force or violence" in an effort to interfere with the exercise of a constitutional right. 5 M.R.S.A. § 4681. No claim of violence, real or threatened has been presented by the parents. Accordingly, we do not reach the other issues raised by the State on this point.

sion the issues before us. Unlike most recent cases addressing educational programs that provide state funding for religious schools,[6] we are not called upon to determine whether a particular program in which state funds benefit religious schools violates the Establishment Clause. Instead, we are presented with the opposite question: whether a tuition program that specifically excludes religious schools violates any of three constitutional provisions: the Establishment Clause of the First Amendment; the Free Exercise Clause of the First Amendment; or the Equal Protection Clause of the Fourteenth Amendment. These distinctions are critical to our analysis.

[¶ 12] Nationally, state legislatures have recently begun undertaking efforts to allow parents more flexibility and increased options in educational decisions through vouchers, tuition reimbursement programs, or tax relief programs.[7] Several of those programs allow participation by parents with children in religious schools. Maine's tuition program does not allow such participation. Accordingly, our analysis is limited to whether either the Maine or federal constitution is violated when the State operates a tuition program that does not allow participation by religious schools.

[¶ 13] Addressing the constitutionality of the statute, the parties recognize that "[w]e have traditionally exercised great restraint when asked to interpret our state constitution to afford greater protections than those recognized under the federal constitution," *State v. Buzzell,* 617 A.2d 1016, 1018 n. 4 (Me.1992), and do not contend that the Maine Constitution affords greater protection than the United States Constitution. *See Blount v. Department of Educ. and Cultural Serv.,* 551 A.2d 1377, 1385 (Me.1988); *School Admin. Dist. No. 1 v. Commissioner, Dept. of Educ.,* 659 A.2d 854, 857 (Me.1995). We therefore address the parents' claims with the understanding that the rights guaranteed by the United States Constitution and the Maine Constitution are coextensive.[8]

---

6. *See Kotterman v. Killian,* 972 P.2d 606 (Ariz. 1999); *Jackson v. Benson,* 218 Wis.2d 835, 578 N.W.2d 602, *cert. denied,* — U.S. —, 119 S.Ct. 466, 142 L.Ed.2d 419 (1998); *Campbell v. Manchester Bd. of Sch. Dirs.,* 161 Vt. 441, 641 A.2d 352 (1994); *Simmons–Harris v. Goff,* Nos. 96APE08–982, 96APE08–991, 1997 WL 217583 (Ohio Ct.App. May 1, 1997).

7. Commentators have noted the increased parental dissatisfaction with public schools. *See, e.g.* Michael A. Vaccari, *Public Purpose and the Public Funding of Sectarian Educational Institutions: A More Rational Approach After Rosenberger and Agostini,* 82 MARQ. L. REV. 1 (1998). "The overall success of the sectarian schools and the inadequacy of many public schools have given rise to a movement for parental choice in education.... In response to these realities, efforts to provide additional educational opportunities are being made throughout the country.... Public officials around the country are desperately seeking creative alternatives to provide increased educational opportunities in their communities." *Id.* at *7–9.

8. Many states have enacted constitutional provisions providing for stricter separation of church and state than that required by the Establishment Clause. *See* Frank R. Kemerer, *The Constitutional Dimension of School Vouchers,* 3 TEX. FORUM ON CIVIL LIBERTIES & CIVIL RIGHTS 137, 181–82 (1998). Ironically, although Maine did not join those states, such provisions in state constitutions are often called "Blaine Amendments," referring to the efforts of James G. Blaine, who, after serving

as Speaker of Maine's House of Representatives, rose to national prominence as a United States Representative, Senator, and Secretary of State.

The genesis of the Blaine Amendments began in the late 1800's resulting from a growing conflict between the supporters of public schools and the supporters of religious, often Catholic, schools. *See* Joseph P. Viteritti, *Blaine's Wake: School Choice, The First Amendment, and State Constitutional Law,* 22 HARV. J.L. & PUB. POL'Y 657, 668–72 (1998). In 1875, President Ulysses S. Grant advocated a "constitutional amendment that would deny public support to religious institutions." *Id.* at 670. At that time, the Supreme Court had not yet held that the First Amendment applied to the states through the Fourteenth Amendment. In response to Grant's request, Blaine, then a United States Senator, proposed an amendment to the United States Constitution which would have applied Free Exercise and Establishment Clause concepts to the states and would have directly prohibited the use of any state's public funds for the support of religious "sects." *See* William P. Gray, Jr., *The Ten Commandments and the Ten Amendments: A Case Study in Religious Freedom in Alabama,* 49 ALA. L. REV. 509, 526 (1998). The primary goal of the amendment was to prohibit any use of state funds to support religious institutions (frequently Catholic schools). At the same time, the reading of the King James (Protestant) version of the Bible was an accepted practice in "public" schools. *See* Douglas Laycock, *The Underlying Unity of Separation and Neutrality,* 46 EMORY L.J. 43, *5 (1997); Kurt T. Lash, *The Second Adoption*

[¶ 14] Because we are asked to review the constitutionality of an act of the Legislature, we "begin with the basic principle of statutory construction that 'this Court is bound to avoid an unconstitutional construction of a statute if a reasonable interpretation of the statute would satisfy constitutional requirements.'" *State v. Cropley*, 544 A.2d 302, 304 (Me.1988) (quoting *Bossie v. State*, 488 A.2d 477, 479 (1985)). We' are also mindful, however, of the unique status of a judicial inquiry into the interpretation of the First Amendment. Where such fundamental rights as those expressed in the First Amendment are at stake, we must examine the issues independently, and we will not limit our inquiry by the constraints of the often relied on deference to legislative findings. *See Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978).

[¶ 15] Our analysis is made in three parts. First, we will determine whether the tuition statute violates the Free Exercise Clause of the First Amendment. Next, we will determine whether the statute as it now exists violates the Establishment Clause of the First Amendment. Finally, we will consider whether the explicit exclusion of religious schools from the tuition program violates the Equal Protection Clause of the Fourteenth Amendment. Because the only basis asserted by the State for its disparate treatment of religious schools is its understanding that the statute in existence prior to the exclusion violated the Establishment Clause, in undertaking the Equal Protection analysis, we will review in greater detail the recent changes in Establishment Clause jurisprudence.

## III. FREE EXERCISE CLAUSE

[¶ 16] The parents first contend that Maine's tuition program violates the Free Exercise Clause by burdening their fundamental right to send their children to religious schools. *See Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The Free Exercise Clause of the First Amendment provides that "Congress shall make no law ... *prohibiting the free exercise [of religion] ....*" U.S. Const. amend., I (emphasis added)[9]. "The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). The party challenging a statute on free exercise grounds must "initially demonstrate: (1) that the activity burdened by the regulation is motivated by a sincerely held religious belief; and (2) that the challenged regulation restrains the free exercise of that religious belief." *Blount v. Department of Educ. and Cultural Servs.*, 551 A.2d at 1379. If the challenger meets that initial burden, "the burden shifts and the State can prevail only by proving both: (3) that the challenged regulation is motivated by a compelling public interest; and (4) that no less restrictive means can adequately achieve that compelling public interest."[10] *Id.*

of the Establishment Clause: The Rise of the NonEstablishment Principle, 27 ARIZ. ST. L.J. 1085, 1147–49 (1995). The House of Representatives passed the amendment, but it was narrowly defeated in the Senate and was never enacted in the U.S. Constitution.

Although the Blaine Amendment failed, it had a significant impact nationally, sparking similar efforts at the state level to prohibit the use of any state funds to support religious education. *See* Kemerer, *supra* at 154–57. The result was that several states amended their constitutions to include a "Blaine Amendment," strictly prohibiting the use of public money for the support of religious institutions. It is also thought that the concepts embodied in the Blaine Amendments were incorporated into the fabric of the First Amendment's Establishment Clause through Supreme Court jurisprudence during the early nineteen hundreds. *See, e.g.*, Viteritti, *supra* at 670–76.

9. The Free Exercise Clause is made applicable to the states by the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

10. Recently the Supreme Court signalled a departure from reliance on the "substantial burden" test. *See Employment Div., Dep't. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (the Free Exercise Clause does not prohibit application of Oregon drug laws to religious ingestion of peyote). *Smith* has been held to "establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law

[¶ 17] The defendants first assert that the parents have failed to generate a genuine issue of material fact in support of their claim that sending their children to Catholic high school constitutes an exercise of religious practice or belief. To preclude a summary judgment on this point, the parents must present some fact tending to prove that attending Catholic school is "not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living ." *Wisconsin v. Yoder*, 406 U.S. 205, 216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Of the parties filing suit, only the Bagleys contend that religion was the motivation for sending their son to Catholic school, and there is limited evidence in the record demonstrating that obtaining a Catholic education for the Bagleys' son is central to their religious beliefs.[11]

[¶ 18] We recognize that courts should be hesitant to delve into the asserted "centrality" of a religious practice, and we would do so only with great caution.[12] Here, however, we are not called upon to undertake that analysis. Assuming *arguendo* that the parents have raised disputes of fact regarding matters central to their religious beliefs, we could not find that any substantial burden has been imposed on the free exercise of those beliefs. "It is well established that there is no substantial burden placed on an individual's free exercise of religion where a law or policy merely 'operates so as to make the practice of [the individual's] religious beliefs more expensive.'" *Goodall v. Stafford County Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995), *cert. denied*, 516 U.S. 1046, 116 S.Ct. 706, 133 L.Ed.2d 661 (1996) (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961)). The concurring opinion of Justice Douglas in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) best articulates this concept.

> The fact that government cannot exact from [a citizen] a surrender of one iota of [her] religious scruples does not, of course, mean that [she] can demand of government a sum of money, the better to exercise them. For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the

has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (a city ordinance dealing with ritual slaughter of animals was not of general applicability and violated the Free Exercise Clause). This change in Free Exercise jurisprudence, however, has not altered the requirement that a law that is not "neutral" and "of general applicability" must be justified by a compelling government interest if it impairs the exercise of religious beliefs. *See id.* at 531–32, 113 S.Ct. 2217. Neither *Smith* nor *Hialeah* are applicable to the matter at bar because the statute at issue is not neutral on its face.

11. The trial court declined to allow the defendants to augment the record with a statement that Mrs. Bagley made to the media in which she indicated that "this is not about religion. This is about my son getting the best education possible." At best, the admission of that statement would have added to the dispute regarding the issue of religious choice. Although Mrs. Bagley does not explicitly assert that the choice of educational placement was "central" to her religion, she did aver that one of her reasons for sending her son to Cheverus was "I am Catholic, and we are raising our children as Catholics. We have always wanted to send our kids to Catholic

schools because we have a duty to teach them about their faith." In contrast, none of the other parents assert specific religious reasons for sending their sons to Cheverus and none of the children attended Catholic schools during the ages that Raymond offered a free public education. Only when the parents reached the point of choosing an appropriate high school did they turn to a religious institution. All of the parents candidly admit that they are seeking to obtain the best education for their children.

12. In *Smith*, the Supreme Court advised caution regarding judicial determinations of the centrality of a religious belief in connection with the "substantial burden" test.

> What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is 'central' to his personal faith? . . . It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds. . . . If the 'compelling interest' test is to be applied at all, then, it must be applied across the board, to all actions thought to be religiously commanded.

*Smith*, 494 U.S. at 887–88, 110 S.Ct. 1595 (citations omitted).

government.[13]

*Id.* at 412, 83 S.Ct. 1790 (Douglas, J., concurring). Section 2591(2) does not prevent the parents from sending their sons to Cheverus. While they will not receive tuition assistance if they choose to do so, they are no more impaired in their efforts to seek a religious education for their sons than are parents of children in school districts that provide only a free nonreligious education in public schools.

[¶ 19] In sum, the Free Exercise Clause is "designed to prevent the government from impermissibly burdening an individual's free exercise of religion, not to allow an individual to exact special treatment from the government." *Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 702 (10th Cir. 1998) (citing *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1353 (10th Cir.1997)); *Braunfeld*, 366 U.S. at 605, 81 S.Ct. 1144 (a statute that makes adherence to religious beliefs "more expensive" does not burden free exercise); *McCarthy v. Hornbeck*, 590 F.Supp. 936, 945–46 (D.Md.1984) (Free Exercise Clause does not mandate that the State subsidize a person's constitutional right to send their children to church-related schools).

[¶ 20] Because we conclude that the parents have failed to generate a material fact upon which a factfinder could conclude that section 2951(2) places a substantial burden on the free exercise of their religion, we conclude that the exclusion of religious schools from the tuition program does not violate the Free Exercise Clause of the First Amendment.

---

13. *See also Brusca v. Missouri,* 332 F.Supp. 275, 279 (E.D.Mo.1971) (quoting with approval Justice Douglas's concurrence in *Sherbert* ); *Jimmy Swaggart Ministries v. Board of Equalization of California,* 493 U.S. 378, 390, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (holding that a collection of sales and use taxes applicable to religious materials did not violate organization's free exercise); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. Lakewood,* 699 F.2d 303, 306 (6th Cir.1983) (holding that "[i]nconvenient economic burdens on religious freedom do not rise to a constitutionally impermissible infringement of free exercise"). *See also Strout v. Commissioner, Maine Dep't of Educ.,* 13 F.Supp.2d 112, 114 (D.Me.1998) (holding that no right exists to require taxpayers to subsidize parents' choice to send their children to religious school).

## IV. ESTABLISHMENT CLAUSE

[¶ 21] The parents next contend that the exclusion of religious schools from Maine's tuition program violates the Establishment Clause.[14] Their reliance on the Establishment Clause in this context is misplaced. The purpose of the Establishment Clause is reflected in the often repeated words of Thomas Jefferson: to build "a wall of separation between Church and State." Letter from Thomas Jefferson Replying to Public Address from Committee of the Danbury Baptist Assn. of Connecticut (Jan. 1, 1802) *in* 3 THE WRITINGS OF THOMAS JEFFERSON 8–9 (H.A. Washington ed., 1861); *see also Reynolds v. United States,* 98 U.S. 145, 164, 25 L.Ed. 244 (1878). The dual concepts of the First Amendment's references to religion are meant to address opposite concerns. The Free Exercise Clause addresses the "negative," it prevents the government from interfering with religious practice, while the Establishment Clause addresses the "affirmative," it prevents the government from sponsoring or establishing a religion. *See Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 730, 20 L.Ed. 666 (1871) ("The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of the civil authority.").

[¶ 22] Distilled to its essence, the Establishment Clause prohibits the government from supporting or advancing religion and from forcing religion, even in subtle ways, on those who choose not to accept it.[15]

---

14. The Establishment Clause is made applicable to the states by the Fourteenth Amendment. *See Everson v. Board of Educ.,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (citing *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)). *See also Maine Human Rights Com'n v. Local 1361, United, Etc.,* 383 A.2d 369, 377, n. 19 (1978).

15. The Supreme Court has written that

The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up

It has no role in requiring government assistance to make the practice of religion more available or easier. It simply does not speak to governmental actions that fail to support religion. Accordingly, we find no support for the proposition that the Establishment Clause prevents a state from refusing to fund religious schools. Having similarly found that no violation of the Free Exercise Clause of the First Amendment has been demonstrated, we conclude that any constitutional deprivation caused by 20–A M.R.S.A. § 2951(2) must arise, if at all, under the Equal Protection provisions of the Fourteenth Amendment.

## IV.   EQUAL PROTECTION

### A.   The Underpinnings of Equal Protection Concepts

[¶ 23] The parents finally contend that 20–A M.R.S.A. § 2951(2) violates the Equal Protection Clause of the Fourteenth Amendment which forbids any state from denying "to any person within its jurisdiction the equal protection of the laws," U.S. CONST. amend. XIV, § 1, and thereby requires that all persons similarly situated must be treated alike. *See Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

[¶ 24] The parents present a somewhat unusual Equal Protection argument. They do not assert that, based on their religion, they have been denied access to education for their children that is available to others.[16] Indeed, the parents have the right to tuition payments for the same range of schools available to all parents in Raymond and have a broader range of options available to them than parents in towns with a public high school. Rather, the parents assert that because they would choose a school that is not approved for the tuition program, and because that school is excluded due to its religious nature, they have been denied equal protection of the laws based on "religion."

[¶ 25] The difficulty in framing the parents' contention as an Equal Protection claim is highlighted by their concession that the State is not required, in towns that have public high schools, to pay for a high school education at a religious school. They further concede that if the State were to provide tuition in towns such as Raymond only for other public schools, they would have no cause of action. Their argument turns therefore on the fact that the State chooses to include private schools in the tuition program but excludes private religious schools. In essence, the parents claim that Cheverus is treated differently because it is a religious school, not that the parents are treated differently because they are Catholic. Ordinarily, the Equal Protection claim here would be asserted, not by potential clients of the excluded institution, but by the school itself.[17] Cheverus, however, is not a party to this action.

[¶ 26] Nonetheless, we conclude that the parents present an important issue worthy of evaluation. For purposes of this analysis, therefore, we will assess the parents' Equal Protection argument assuming *arguendo* that the parents' lack of opportunity to have the State pay the tuition for their children to attend a private religious school results in *their own* disparate treatment on the basis of their religion.

### B.   The Level of Scrutiny

[¶ 27] Because the parents assert that they have been denied the equal protection of the laws, we must first address the

---

a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever from [sic] they may adopt to teach or practice reli-

gion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.
*Everson v. Board of Educ.*, 330 U.S. at 15–16, 67 S.Ct. 504.

**16.** *See, e.g., Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993).

**17.** *See, e.g., Columbia Union College v. Clarke*, 159 F.3d 151 (4th Cir.1998).

level of scrutiny to be given to the State's action. "If a challenged statute infringes a fundamental constitutional right or involves an inherently suspect classification such as *race or religion,* it is subject to analysis under the strict scrutiny standard." *School Admin. Dist. No. 1 v. Commissioner, Dep't of Educ.,* 659 A.2d 854, 857 (Me.1995) (emphasis added). Strict scrutiny requires that the challenged action be narrowly tailored to achieve a compelling governmental interest. *See Butler v. Supreme Judicial Court,* 611 A.2d 987, 992 (Me.1992).

[¶ 28] In contrast, if a challenged statute does not involve either a fundamental right or a suspect class, "different treatment accorded to similarly situated persons need only be rationally related to a legitimate state interest." *School Admin. Dist. No. 1,* 659 A.2d at 857. When a statute is reviewed under the rational basis standard, it bears a strong presumption of validity. *See id.*

[¶ 29] The tuition statute, 20–A M.R.S.A. § 2951(2), explicitly excludes only those private schools with religious affiliations. As the Supreme Court has stated "[j]ust as we subject to the most exacting scrutiny laws that make classifications based upon race ... so too we strictly scrutinize governmental classifications based on religion." *Employment Div. Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 886 n. 3, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (citations omitted).

[¶ 30] Notwithstanding the obvious disparate treatment of religious schools under Maine's tuition statute, the defendants advocate the use of the rational basis standard. The defendants first contend that we must view Equal Protection claims, when accompanied with a Free Exercise claim, as a "reprise" of the Free Exercise argument. *See Blount v. Department of Educ. and Cultural Servs.,* 551 A.2d 1377, 1385–86 (Me.1988) (holding that the State's prior approval of educational choices for children, including home-schooling, did not violate Free Exercise or Equal Protection). Reliance on *Blount,* however, is misplaced. In *Blount,*

we characterized the Equal Protection claim as a "reprise" of the Free Exercise claim because, based on the facts, review of the Equal Protection claim dictated rational basis scrutiny. The statute "[h]aving already survived strict scrutiny under the First Amendment" could readily pass rational basis scrutiny. *See id.* Here, however, we do not reach an analysis of the statute under the Free Exercise compelling interest standard. Thus, an Equal Protection analysis is not redundant. Furthermore, nothing we stated in *Blount* eliminated the possibility that, in some circumstances, Equal Protection may provide more protection than the Free Exercise Clause. *Blount* is therefore not applicable to the present scenario.

[¶ 31] Second, the defendants contend that there is no basis for an Equal Protection challenge based upon school funding. Here they rely on *Norwood v. Harrison,* 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), where the Court addressed such a challenge in another context.

> It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid.

*Id.* at 462, 93 S.Ct. 2804.[18] The general proposition set forth in *Norwood,* however, does not reach the more narrow question presented in the matter before us. The question is not whether the State must support religious schools in general. The question is whether, having decided to create a tuition program that allows parents to choose private schools, the State may exclude private religious schools from receipt of state funds.

[¶ 32] Thus, the defendants' contention that rational basis scrutiny applies is incorrect. Ultimately, however, the debate

---

18. Additionally, the Maine Constitution only requires that "the legislature are authorized, and it shall be their duty to require the several towns to

make suitable provision, at their own expense, for the support and maintenance of public schools...." Me. Const. art. VIII, pt. 1, § 1.

over the level of scrutiny is purely academic. The State offers only one justification for the statute—an effort to comply with the Establishment Clause. Accordingly, it makes little difference whether we classify the level of scrutiny as strict or requiring only a rational basis. If the State's justification is based on an erroneous understanding of the Establishment Clause, its justification will not withstand any level of scrutiny.

## C. Application of the Establishment Clause to the Tuition Program

[¶ 33] Because classification on the basis of religion is distinct as the only classification which carries with it a converse prohibition against government involvement or entanglement, we must address the balance between the competing constitutional mandates of the First and Fourteenth Amendments. If the exclusion of religious schools is not required by the Establishment Clause of the First Amendment, it must be struck down because the State offers no other reason for its existence. If the exclusion is required in order to comply with the Establishment Clause, the State will have presented a compelling justification for the disparate treatment of religious schools, and the parents' Equal Protection claim will fail. *See Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (agreeing that compliance with constitutional obligations "may be characterized as compelling.")

### 1. Development of Establishment Clause Jurisprudence

[¶ 34] We look first to the history of the religious exclusion contained in 20–A M.R.S.A. § 2951(2) and the reason for its enactment. Prior to 1981, religious schools were treated no differently than any other private school under Maine's tuition program. In response to concerns about payment of state funds to religious schools, the Legislature sought and received an Opinion of the Attorney General. That opinion concluded that the provision allowing payments to religious schools violated the Establishment Clause. *See* Op. Me. Att'y Gen. 80–2. The ensuing enactment of the religious exclusion brought about significant changes in at least one religious school that had relied extensively on state tuition funds for operation.[19]

[¶ 35] The Legislature enacted the exclusion in 1981 in direct response to developments in Establishment Clause jurisprudence during the 1970's. Placing those developments in a historical context demonstrates that the Legislature had little choice but to adopt the exclusion if it chose to continue its tuition program.

[¶ 36] The Supreme Court's evolving treatment of the Establishment Clause has been a study in the changing forces of our society. Although much has been written by eminent scholars on the intertwining of church and state through the decades, our understanding of current decisional doctrine in this mutable area best begins with *Everson v. Board of Educ.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). There, a New Jersey statute authorized reimbursement to parents for the expenses of transporting children to school on public busses, including parents of children riding the busses to religious schools. *See id.* at 4–5, 67 S.Ct. 504. The Supreme Court found no violation of the Establishment Clause. Writing for the Court, Justice Black wrote that "[t]he First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach. New Jersey has not breached it here." *Id.* at 18, 67 S.Ct. 504. Accordingly, the Court refused to strike down programs that provided transportation to religious as well as nonsecular schools.

[¶ 37] *Everson* was followed twenty years later by *Board of Educ. v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). In *Allen*, the Court similarly upheld a New

19. One of Maine's four Roman Catholic high schools, John Bapst High School, in Bangor, closed as a result of being excluded from the education tuition program. *See Bangor Catholic School to Shut Down*, PORTLAND PRESS HERALD, April 30, 1980, at 13. When the Attorney General released his opinion, "124 of Bapst's 308 students were receiving state tuition subsidies." David Himmelstein, *Only $2 Million Miracle Could Keep Bapst Going*, MAINE SUNDAY TELEGRAM, May 4, 1980, at A14.

York statute requiring local public school authorities to lend textbooks free of charge to all students in grades 7 through 12, including students attending religious schools. *See id.* at 238, 88 S.Ct. 1923. The Court found that the books were provided to further educational opportunities for children and only benefitted the parents of children in religious schools and not the religious schools themselves because the books technically were owned by the State. *See id.* at 243–44, 88 S.Ct. 1923.

[¶ 38] Beginning in the early 1970's, however, the Court evidenced a significant shift in its focus, from the public purpose of the program under scrutiny, to the possible benefits to the religious institutions at issue. In 1971, the Court acknowledged the difficulties it had encountered in attempting to delineate the point at which a seemingly neutral program crosses the line into a violation of the Establishment Clause: "[c]andor compels acknowledgement ... that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To bring greater clarity to that demarcation, the Court announced a three-part test which would assist courts in drawing lines to protect against "the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activities.'" *Id.* (quoting *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)).

[¶ 39] The "Lemon Test" comprises a three-pronged analysis, "gleaned" from prior cases, requiring that: "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ... and finally, the statute must not foster 'an excessive government entanglement with religion.'" *Id.* at 612–13, 91 S.Ct. 2105 (citations omitted). Any statute that

ran afoul of any one of those tenets would be held to violate the Establishment Clause.

[¶ 40] In several cases following *Lemon,* the Court struck down, in whole or in part, state programs designed to assist parents with educational costs where the programs at issue allowed that assistance to benefit religious schools. During this period, the Court invalidated New York tax laws that provided direct money grants to qualifying nonpublic schools for maintenance and repair of facilities and equipment; a tuition reimbursement plan for parents of children attending nonpublic schools; and tax relief to parents failing to qualify for tuition reimbursement. *See Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). It then struck down a Pennsylvania law that provided for loans of educational materials and equipment directly to religious schools, *see Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), and invalidated a program that placed public school teachers in religious school classrooms for certain classes, *see School Dist. v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985).

[¶ 41] In his opinion regarding the constitutionality of the tuition program, the Attorney General relied heavily on *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955 (1973) in determining that including religious schools in the tuition system violated the Establishment Clause. The *Nyquist* Court found that although the programs had secular purposes in protecting the health and safety of private school students, they failed the "effect" prong of the *Lemon* test because the vast majority of the money went to religious institutions. *See id.* at 775–83, 93 S.Ct. 2955.[20] The Court also held that "[i]n the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that *direct aid in whatever form is invalid.*" *Id.* at 780, 93 S.Ct. 2955 (emphasis added). Furthermore, the Court concluded

---

**20.** In both *Allen* and *Everson,* the benefit conferred upon the religious school by the state statute was indirect. By providing funding for school books and transportation, the state marginally decreased the cost to parents of children attending religious schools. At no point would state revenue flow from the state coffers into the hands of religious schools.

that the result was the same whether the funds were channeled to the parents or paid directly to the schools.[21] *See id.* at 785–88, 93 S.Ct. 2955.

[¶ 42] Application of the concepts set forth in *Nyquist* led to the inevitable conclusion that Maine's all encompassing tuition program violated the Establishment Clause. Before the enactment of the exclusion, the tuition program required school administrative districts to pay tuition directly to the private school—precisely the "direct aid" prohibited by *Nyquist.* If the tuition was not paid by the district within 30 days of the billing date, the State paid the bill and deducted that amount from the state school subsidy to the school administrative unit owing tuition. *See* 20–A M.R.S.A. § 5810(2). There were no safeguards within Maine's system to ensure that state funding was only used for secular purposes. The amount of the tuition was intended to cover the average per-student cost, which could include expenses for religious classes, religious studies, and religious events. *See* 20–A M.R.S.A. § 5805(1). The tuition was paid in a lump sum directly to the religious school of a parent's choice. Thus, the State's tuition system, as written prior to the 1981 amendment, would have been found in violation of the Establishment Clause.

### 2. Changes in Establishment Clause Jurisprudence Since 1981

[¶ 43] The parents urge us to conclude, however, that recent changes in the Supreme

Court's analysis of the Establishment Clause have resulted in the elimination of the necessity for the religious exclusion. There is no question that, between 1981 and the present, the "lines of demarcation" in Establishment Clause analysis have shifted once again.[22]

[¶ 44] The changes can be seen both in the tools used by the Court to analyze alleged Establishment Clause violations and in the nature of governmental involvement in religious schools that the Court has become willing to tolerate.

[¶ 45] We first examine the changes in the analytical tool utilized by the Supreme Court in these cases. The *Lemon* Test, announced in 1971, was applied to all school cases in the 1980's. The application of the *Lemon* Test, however, has been fluid at best. In *Nyquist,* the Court held that "there is no single constitutional caliper" for determining whether a state action violates the Establishment Clause and that tests such as those announced in *Lemon* should be "viewed as guidelines." 413 U.S. at 773 n. 31, 93 S.Ct. 2955 (citations omitted). In *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the Court found the Lemon test to be "no more than a helpful signpost." *Id.* at 394, 103 S.Ct. 3062 (citations omitted). And in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), it noted that the Lemon Test has never been binding on the Supreme Court. *See id.* at 679, 104 S.Ct. 1355.

21. The Court stated that:
[I]f the grants are offered as an incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions. Whether the grant is labeled a reimbursement, a reward, or a subsidy, its substantive impact is still the same.
*Id.* at 786, 93 S.Ct. 2955.

22. The transition in Supreme Court philosophy was not smooth. In the 1980's, the Court wavered between a strict and a broad interpretation of the Establishment Clause. In *School Dist. v. Ball,* 473 U.S. 373, 105 S.Ct. 3216 (1985), the Court held that programs in which classes for nonpublic school students are financed by the public school system, taught by public school teachers, and conducted in "leased" classrooms in the nonpublic schools violated the Establish-

ment Clause. The Court, focusing on the statute's "effect," held that "there is a substantial risk that, overtly or subtly, the religious message [the teachers] are expected to convey during the regular schoolday will infuse the supposedly secular classes they teach after school." *Id.* at 387, 105 S.Ct. 3216. And in *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), the Supreme Court held that an Alabama statute authorizing public school teachers to hold a one-minute moment of silence for "meditation or voluntary prayer" violated the Establishment Clause. *See id.* at 56–62, 105 S.Ct. 2479. The Court held, for the first time, that the statute violated the first prong of the Lemon Test, no secular purpose, because the sponsor of the bill specifically stated that the purpose of the law was an "effort to return voluntary prayer" to the public schools. *Id.* at 56–57, 105 S.Ct. 2479.

[¶ 46] Most recently, in *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the Court acknowledged the continuing efficacy of a *Lemon*-like analysis but suggested that the effect and entanglement prongs must be seen as parts of a unitary consideration. As one court noted, "[t]he court essentially collapsed the Lemon Test so that the focus is on whether the challenged activity has the effect of advancing religion." *Porta v. Klagholz*, 19 F.Supp.2d 290, 297 (D.N.J.1998).

[¶ 47] We turn then to the recent decisions in which the Supreme Court has reviewed other school aid programs for Establishment Clause compliance. Two decisions bookend those changes: *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) and *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391. In *Mueller*, the Court upheld a Minnesota law allowing taxpayers, in computing their state income tax, to deduct expenses incurred in providing for the education of their children, including tuition, transportation, and textbooks, without regard to the secular or religious nature of the school at issue. *See* 463 U.S. at 390, 103 S.Ct. 3062. The Court accepted the State's secular purpose, stating that "governmental assistance programs have consistently survived this inquiry even when they have run afoul of other aspects of the Lemon framework." *Id.* at 394, 103 S.Ct. 3062. The *Mueller* Court distinguished *Nyquist* and relied upon several factors in finding no impermissible effect of advancing religions: the tax deduction is one of several available under Minnesota law; the deduction is available for only educational expenses, not for religious expenses; the tax is available to all parents; and the aid is a benefit to and is channeled through individual parents, not the schools. *See id.* at 396–99, 103 S.Ct. 3062. The Court held that "[t]he historical purposes of the [Establishment] [C]lause simply do not encompass the sort of attenuated financial benefit, ultimately controlled by the private choices of individual parents, that eventually flows to parochial schools from the neutrally available tax benefit at issue in this case." *Id.* at 400, 103 S.Ct. 3062.

[¶ 48] In the decade and a half that followed *Mueller*, the Court inched further away from its more restrictive line-drawing. In *Witters v. Washington Dep't of Servs. for. the Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), the Court again acknowledged that direct cash subsidies to a religious school would not be approved, but held that "the Establishment Clause is not violated every time money previously in the possession of a State is conveyed to a religious institution." *Id.* at 486, 106 S.Ct. 748. It determined that a single grant of aid to a blind college student for his training to become a pastor did not violate the Clause, noting that no other person had ever sought to use state grant money for that purpose and that the grant monies were provided directly to the student, not to the religious college. *See id.* at 488, 106 S.Ct. 748. Then in *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), the Court determined that allowing a school district to provide a sign-language interpreter to accompany a student to his classes at a Catholic High School did not violate the Establishment Clause. Distinguishing those facts from cases involving direct cash subsidies to religious schools, the Court noted that "no funds traceable to the government ever find their way into sectarian schools' coffers." *Id.* at 10, 113 S.Ct. 2462.

[¶ 49] Finally, in *Agostini*, the Court explicitly overruled a prior decision in which it had concluded that the Establishment Clause prevented public school teachers from assisting underprivileged children in religious schools. *See Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985).[23] The

---

**23.** The decision in *Aguilar* resulted from the efforts of the City of New York to provide remedial education to disadvantaged children attending private schools. In 1965, Congress enacted Title I of the Elementary and Secondary Education Act of 1965 to provide funds to local educational agencies for education, guidance, and job counseling to eligible students. *See* 20 U.S.C. § 6301 *et seq.* (1994). Although the services may be provided to children in private schools, there are numerous constraints not applicable when it provides aid to public schools. In an effort to provide these services to children in private school, the city first tried bussing the students from private to public school. When this attempt proved unsuccessful, the city sent the teachers

change in approach resulted from two significant modifications in Supreme Court analysis announced in cases subsequent to *Aguilar*. *See Agostini*, 521 U.S. at 223–25, 117 S.Ct. 1997. First, the Court abandoned any notion that placing "public employees on parochial grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion." *Id.* at 223, 117 S.Ct. 1997. Second, the Court departed from the rule that "all government aid that directly aids the educational functions of religious schools is invalid." *Id.* at 225, 117 S.Ct. 1997.

[¶ 50] Writing for the Court, Justice O'Connor concluded in *Agostini* that recent Establishment Clause cases had undermined some of the assumptions on which cases decided over the preceding decade had been built, but concluded nonetheless that the general principles used to evaluate alleged Establishment Clause violations remain valid: "we continue to ask whether the government acted with the purpose of advancing or inhibiting religion, and the nature of that inquiry has remained largely unchanged.... Likewise we continue to explore whether the aid has the 'effect' of advancing or inhibiting religion." *Id.* at 222–23, 117 S.Ct. 1997 The Court then took pains to identify the limits of its holding, emphasizing that no money flowed to the religious school and that the services of the public employee did not supplant the school's ordinary educational functions or relieve it of costs it would otherwise have borne in the student's education. *See id.* at 223–31, 117 S.Ct. 1997.

### 3. School Aid Programs in Other States

[¶ 51] In recognition of the changes in the Supreme Court's Establishment Clause jurisprudence, several states have enacted statutes aimed at providing financial assistance to parents of students attending religiously affiliated schools. For example, in 1995, the

into the private schools. The Supreme Court, in *Aguilar*, held that the Establishment Clause barred the City of New York from sending public school teachers into religious schools to provide remedial education to disadvantaged children. *See* 473 U.S. at 414, 105 S.Ct. 3232; *Agostini*, 521 U.S. at 208–14, 117 S.Ct. 1997.

Ohio Legislature enacted a statute that provided need-based scholarships to students in Cleveland that may be used in public or private schools. *See Simmons–Harris v. Goff*, Nos. 96APE08–982, 96APE08–991, 1997 WL 217583 (Ohio Ct.App., May 1, 1997).[24] The Pilot Scholarship Program was enacted in response to an educational crisis in the Cleveland City School District so severe that the State was ordered by a federal court to take over administration of the district. *See id.* at *1. The scholarship program was drafted so that the money does not flow directly from the State to religiously affiliated schools. Where a scholarship recipient chooses a public school, the State issues a check payable directly to the school. Where the scholarship recipient has chosen a private school, however, the State delivers a check, made payable to the parents, who must endorse the check to the school. *See id.* Although the Ohio trial court upheld the program in the face of a constitutional challenge, an intermediate appellate court struck down the program "[b]ecause the scholarship program provide[d] direct and substantial, non-neutral government aid to sectarian schools," and had the primary effect of advancing religion in violation of the Establishment Clause. *See id.* at *10. An appeal of that decision is pending before the Ohio Supreme Court.

[¶ 52] In 1998, the Wisconsin Supreme Court upheld a statute permitting sectarian schools to participate in the Milwaukee parental school choice program. *See Jackson v. Benson*, 218 Wis.2d 835, 578 N.W.2d 602, *cert. denied*, —— U.S. ——, 119 S.Ct. 466, 142 L.Ed.2d 419 (1998). The program, enacted to enable economically disadvantaged children in Milwaukee to attend private schools, authorized the State to issue tuition vouchers to approved private schools, both sectarian and nonsectarian, in the name of parents of

24. Scholarship recipients receive a fixed percentage of the private school tuition, up to a maximum of $2,500. "Recipients whose family income is not more than two hundred percent of the federally established poverty level receive ninety percent of their school tuition, while recipients whose family income is above this 'low income' threshold receive seventy-five percent of their school tuition." *Id.*

students attending the school.[25] *See id.* at 608–09. In order for the school to obtain state funding, the voucher must then be endorsed to the school by the parent whose name appears on the voucher. *See id.* at 608–09.[26] The Supreme Court declined a petition for *certiorari* in this matter.[27]

[¶ 53] Very recently, the Arizona Supreme Court upheld a state tax credit, of up to $500, equal to the amount individuals donate to school tuition organizations.[28] *See Kotterman v. Killian,* 193 Ariz. 273, 972 P.2d 606 (1999). The Court upheld the statute against a claim of an Establishment Clause violation, holding that "[p]rivate and sectarian schools are at best only incidental beneficiaries of this tax credit, a neutral result that we believe is attenuated enough to satisfy *Mueller* and the most recent Establishment Clause decisions." *Id.* at 616 (citations omitted).

[¶ 54] Although the recent efforts of Arizona, Ohio, Vermont, and Wisconsin provide a backdrop for our analysis, they do not provide persuasive authority for interpretation of the Establishment Clause. The Supreme Court has not yet reviewed any of these programs, and it is not clear which of

them, if any, would be found to pass muster under an Establishment Clause analysis. Moreover, although the efforts of other states demonstrate that the Supreme Court's changing attitude in Establishment Clause jurisprudence has encouraged other state legislatures to create new programs offering financial assistance to parents of students attending religiously affiliated schools, none speaks to the issue before us today.

### 4. The Maine Tuition Program Today

[¶ 55] Nonetheless, pointing to the efforts undertaken by a few other state legislatures to include religious schools in various school aid programs, the parents urge us to conclude that Maine's tuition program can no longer withstand a constitutional challenge because it continues to exclude religious schools. Maine's tuition program has not changed in any substantive manner since the exclusion was enacted in 1981. The program still provides direct tuition payment to the school of the parents' choice. With the exception of certain certification requirements, it does not place any restrictions or limita-

**25.** In order to qualify for participation in the program the student must be "a member of a family that has a total family income that does not exceed an amount equal to 1.75 times the poverty level determined in accordance with criteria established by the director of the federal office of management and budget." Wis. Stat. § 119.23(2)(1) (1998).

**26.** Before the enactment of the statute allowing religious schools to participate in the program, the Wisconsin voucher program was challenged on grounds identical to those before us today. *See Miller v. Benson,* 878 F.Supp. 1209 (E.D.Wis. 1995). The federal district court upheld the exclusion of religious schools: "The present state of First Amendment law compels this court to hold that the plaintiffs' request to expand the current Choice Program to make tuition reimbursements directly payable to religious private schools who admit eligible Choice Program schoolchildren would violate the Establishment Clause. The current Program is constitutional." *Id.* at 1216. On appeal, the Seventh Circuit determined that, because the Wisconsin Legislature had recently removed the portion of the statute eliminating religious schools from the tuition program, the issue was moot. *See Miller v. Benson,* 68 F.3d 163 (7th Cir.1995).

**27.** Prior to 1996, Vermont utilized a school-choice program, similar to the Wisconsin system, whereby students living in participating districts

could attend approved public or private high schools, including religiously affiliated schools. *See* 16 V.S.A. § 822(a)(1). The constitutionality of that statute withstood a limited challenge in 1994. *See Campbell v. Manchester Bd. of Sch. Dirs.,* 161 Vt. 441, 641 A.2d 352, 358 (1994). ("Recognizing that direct payments to a sectarian institution may raise additional considerations, *we do not address the validity of a direct payment to a sectarian institution.*") (Emphasis added.) The statute's current validity, however, is in question. In 1996, the State's department of education terminated all general state aid to a school district because it approved the use of public funds to pay the tuition of fifteen students attending a religiously affiliated school, declaring the payment unconstitutional. The school board disagreed and filed an action in state court. In July of 1997, the trial court upheld the education department's decision. *See Chittenden Town Sch. Dist. v. Department of Educ.,* No. SO478–96 (Vt. Rutland Cty.Super. Ct. June 27, 1997). The trial court's decision is currently under appeal.

**28.** School tuition organizations are charitable organizations that allocate at least 90 percent of their annual revenue for educational scholarships or tuition grants. *See* A.R.S. 43–1089 (1997).

tions on the use of the funds or the content of the course offerings. It therefore continues to provide for a payment of a substantial amount of money directly to the schools participating in the program.

[¶ 56] A careful review of the teachings of *Mueller, Zobrest, Witters* and *Agostini,* leads us to conclude that, notwithstanding the shifts in Establishment Clause jurisprudence since the enactment of the religious school exclusion, in the absence of that exclusion, Maine's tuition program would violate the Establishment Clause.

[¶ 57] We undertake this analysis within the framework utilized by the *Agostini* Court, asking first whether the statute has a "secular legislative purpose." We conclude, as have most other courts addressing similar questions, that the education of the State's children is of such paramount importance that it provides a valid secular reason for state expenditures. *See, e.g., Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. at 773, 93 S.Ct. 2955. Indeed, there are few other governmental pursuits that involve such important public policy considerations and such an extensive history of governmental involvement. We conclude therefore, "[a]s has often been true in school aid cases, there is no dispute as to the first test." *School Dist. v. Ball,* 473 U.S. 373, 383 (1985). *See also Mueller v. Allen,* 463 U.S. 388, 394, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983).

[¶ 58] We next ask whether the program, without the exclusion, would have the "impermissible effect of advancing religion." *Agostini* at 219, 117 S.Ct. 1997.[29] Here, we conclude that the tuition program, without

the religious school exclusion, would indeed have the "effect" of advancing religion.

[¶ 59] In contrast to programs that provide secular textbooks to children in religious schools (*Allen*), that provide special education teachers to children at religious schools (*Agostini*), that allow an interpreter to assist a hearing impaired child on religious school grounds (*Zobrest*), or that provide tax benefits to parents who must pay for their children's education (*Everson*), the Maine tuition program provides a direct financial subsidy to the schools. Each of the programs approved by the Supreme Court provide specific limited services to children in religious schools or provide limited financial benefits to the parents of those children, only indirectly benefitting the religious school.[30]

[¶ 60] Maine's tuition program, however, results in state monies flowing directly to the religious institution, thereby funding the bulk of the school's costs for the education (religious and secular) of the child at issue. The tuition is based on the individual school's expenditures, capped by a state average, the payments are made directly to the school, and no limit or restriction is placed on the use of the State's payment by the schools. Although the school is chosen by parents, not the State, choice alone cannot overcome the fact that the tuition program would directly pay religious schools for programs that include and advance religion.

[¶ 61] None of the Supreme Court's decisions to date have ever intimated that such direct subsidies of religious schools could survive an Establishment Clause challenge.[31]

---

**29.** Whether prong two and three are considered separately, as in *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105 (1971), or are collapsed into one test, as in *Agostini,* the next part of the analysis is similar.

**30.** The Court also allowed the payment of college grant funds to a blind student seeking to train as a minister. *See Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). That case has little applicability to the facts before us. The Court noted that no other student had ever requested grant funds for such a purpose; the funds went directly to the student for use at the college of his choice; and the single grant would provide an attenuated benefit not to a high school, but to a college, institutions seen as distinct regarding

concerns about the advancing of religion or inculcation of younger students. *See id.* at 488–89, 106 S.Ct. 748.

**31.** Nonetheless, the parents point to footnote 38 in the *Nyquist* decision, in which the Court noted that it was not opining as to public assistance made available generally without regard to the "sectarian-nonsectarian or public-nonpublic nature of the institution benefitted," *Nyquist,* 93 S.Ct. at 2970, n. 38, as support for their position that the Supreme Court would not invalidate Maine's tuition program if it allowed tuition payments to religious schools. Their argument mistakenly reads an affirmative holding into the Court's mere delineation of the issues it was *not* deciding. It also ignores the import of caution

Indeed, in the case relied on most heavily by the parents, *Agostini*, the Court found it important that "No Title I funds ever reach the coffers of religious schools." *Agostini*, 521 U.S. at 228, 117 S.Ct. 1997 (distinguishing *Committee for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646, 657–59, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980)). Moreover, the *Agostini* Court found it significant that the services provided at the religious school supplemented rather than supplanted the costs that would otherwise be born by that school. *See id.* at 229, 117 S.Ct. 1997. In Maine, the tuition payment paid by the State to the chosen school would substantially "supplant" the costs that would otherwise be borne by the school. To allow the State to do so for religious schools would directly contradict the teachings of *Agostini*. As the Fourth Circuit recently noted, "[t]he Supreme Court has never upheld a direct transfer of monies to a pervasively sectarian institution to fund its core educational functions." *Columbia Union College v. Clarke*, 159 F.3d 151, 162 (4th Cir.1998).

[¶ 62] The direct, substantial, and unrestricted nature of the financial benefit provided to a recipient school is starkly demonstrated by the record in this case. According to the calculations of the Department of Education, if Cheverus had been approved to receive tuition under the program, it could have received up to $5,379.63 per student, per year. The 1997–1998 tuition for a student attending Cheverus was $5,450. Thus, the tuition program would have covered almost the entire payment expected from parents. While the standard tuition payment at Cheverus does not cover the entire cost to the school per student, it does cover approximately 70% of those costs.[32] That kind of direct cash aid from the State to a religious institution is neither the "attenuated financial benefit" approved in *Mueller*, nor "aid that directly aids [only] the educational functions" approved in *Agostini*.

[¶ 63] Nor can it be disputed that the educational functions of Cheverus are intertwined with its religious goals. As it sets forth in its "Purposes and Objectives," "Cheverus regards the education of character (moral and spiritual education) as its most important purpose and objective as a school. The school works to implement the objective through a doctrinally faithful and morally challenging program of religious education and through liturgies, retreats, and community service." Full tuition payments to a religious school such as Cheverus would provide a direct, not attenuated, benefit and would directly aid the religious as well as the educational functions of the school.

[¶ 64] Finally, we address the State's concern that the elimination of the exclusion would result in excessive entanglement of the government in religious affairs.[33] "Not all entanglements, of course, have the effect of advancing or inhibiting religion.... Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini*, 521 U.S. at 233, 117 S.Ct. 1997. Signaling the lowering of the "high and impregnable walls" between church and state referred to in earlier cases, the Court in *Agostini* opined that "[i]nteraction between church and state is inevitable.... and we have always tolerated some level of involvement between the two." *Id.* (citations omitted).

[¶ 65] Although, by this language, we understand the Court to have announced a greater tolerance of interaction between

---

against providing "a basis for approving through tuition grants the complete subsidization of all religious schools on the ground that such action is necessary if the State is fully to equalize the position of parents who elect such schools—*a result wholly at variance with the Establishment Clause." Id.* (Emphasis added).

**32.** John H.R. Mullen, principal at Cheverus, estimated in his affidavit that the average cost of educating a student at Cheverus during the 1996–97 school year was $7630.

**33.** Much has been written regarding the continuing applicability of the "entanglement" prong of the *Lemon* test. *See, e.g.,* Christopher D. Pixley, *The Next Frontier in Public School Finance Reform: A Policy and Constitutional Analysis of School Choice Legislation,* 24 J. Legis. 21, 57 n. 201 (1998). The *Agostini* Court recognized it as an important part of the analysis, but perceived the entanglement question as a piece of its analysis on whether the government aid has the "effect" of advancing religion. *Agostini,* 521 U.S. at 232–33, 117 S.Ct. 1997.

church and state,[34] the *Agostini* Court unambiguously affirmed its previous holdings that excessive entanglement will "run afoul of the Establishment Clause." *Id.* The question therefore becomes: what level of interaction constitutes an "excessive" amount. To assess entanglement, we review three aspects of the interaction between the State and the religious school: (1) the character and purposes of the schools that are benefitted; (2) the nature of the aid that the State provides; and (3) the resulting relationship between the religious school and the State. *See id.* at 232, 117 S.Ct. 1997.

[¶ 66] We have addressed the first two aspects previously. In the absence of the exclusion, the institutions benefitted by the tuition program would include public, private, and private-religious schools, including those that are pervasively sectarian. The nature of the aid is direct cash payments, unrestricted in use, to the schools.

[¶ 67] The third aspect, the resulting relationship between the State and the religious school, is more difficult to quantify. The school must report annually to the commissioner "the information the commissioner may require." 20–A M.R.S.A. § 2952. The school must submit its "books, accounts, financial documents and reports to the commissioner" for review and audit. *See* 20–A M.R.S.A. § 2953. The school will be subject to any rules duly adopted by the commissioner "regarding tuition charges, accounting, audits, contracts and other aspects of schooling privileges" arranged between it and the school administrative units. *See* 20–A M.R.S.A. § 2954. In the abstract, these requirements have the appearance of creating an excessive entanglement. We could not, however, make a final determination on this issue on the record before us. Because the tuition program has not included religious schools for the past 18 years and has therefore not encountered problems of entanglement, neither the rules nor the practical application of the statutory requirements were addressed in detail in the Superior Court.[35]

[¶ 68] If the level of interaction between the State and Cheverus, absent the exclusion, were potentially dispositive in this case, we would remand the matter for further development of the record. Because we conclude, however, that the undisputed facts in the record make it abundantly clear that the tuition program, consisting of substantial unrestricted cash payments to religious institutions, would have an impermissible "effect" of advancing religion, we are not required to reach a final determination regarding the entanglement problem. A statute that has the effect of advancing religion violates the Establishment Clause, whether or not it results in an impermissible level of interaction between church and state.

[¶ 69] In a final effort to overcome the Establishment Clause impediment, the parents turn to several Free Speech decisions of the Supreme Court. This effort is also unavailing. In *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), the Court struck down a public university's exclusion of religious organizations from the use of the university's meeting rooms and facilities, holding that "[t]he Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." *Id.* at 267–68, 102 S.Ct. 269. In a similar case, the Court found that the University of Virginia had violated the Free Speech principles of the First Amendment when it declined to reimburse religious groups for printing costs but provided reimbursement for all other groups. *See Rosenberger v. Rector & Visitors of the Univ. of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

[¶ 70] The issue before us is wholly distinct from those cases. The parents cannot assert that they have been denied a forum for any type of speech. Rather, they seek to have the State pay for their children's education. Moreover, the *Rosenberger* Court explicitly distinguished school aid cases when it noted

**34.** *See, e.g.,* Christian Chad Warpula, *The Demise of Demarcation: Agostini v. Felton Unlocks the Parochial,* 33 WAKE FOREST L. REV., 465, 506–07 (1998).

**35.** Ordinarily, a court undertaking an entanglement analysis does so in the context of reviewing a state program that *does provide* aid to a religious institution.

that "[t]his case is not controlled by the principle that special Establishment Clause dangers exist where the government makes direct money payments to sectarian institutions, ... since it is undisputed that no public funds flow directly into [the religious group]'s coffers under the program at issue." *Id.* at 821, 115 S.Ct. 2510 (citations omitted).

[¶ 71] That state funds would flow directly into the coffers of religious schools in Maine were it not for the existing exclusion cannot be debated. If the religious school exclusion were eliminated, the State would likely pay more than $5,000 per student per year to Cheverus High School, without restriction on the use of those funds. In the entire history of the Supreme Court's struggle to interpret the Establishment Clause it has never concluded that such a direct, unrestricted financial subsidy to a religious school could escape the strictures of the Establishment Clause. While it may be possible for the Legislature to craft a program that would allow parents greater flexibility in choosing private schools for their children, the current program could not easily be tailored to include religious schools without addressing significant problems of entanglement or the advancement of religion. It is up to the Legislature, not the courts, to determine whether and how to attempt to structure such a program.[36]

[¶ 72] Accordingly, we conclude that the current exclusion of religious schools from Maine's tuition program does not violate the Free Exercise or Establishment Clauses of the First Amendment or the Equal Protection mandates of the Four-teenth Amendment. Because we affirm the judgment of the Superior Court, we do not reach the parents' challenge to the court's dismissal of the cause of action against the Town of Raymond or the defendants' challenge to the trial court's evidentiary rulings.

The entry is

Judgment affirmed.

CLIFFORD, J., dissenting.

[¶ 73] Although I have little quarrel with much of the Court's analysis of current Supreme Court case law as it relates to the constitutionality of Maine's public and private school tuition program, I disagree with its final conclusion that the program is constitutional. In my view, the program, as presently constituted, violates the rights of the parents guaranteed by the Equal Protection Clauses of the federal and state constitutions.[37] Accordingly, I respectfully dissent.

[¶ 74] Applying to towns without their own public school system, 20–A M.R.S.A. § 5204 allows parents to choose the schools their children will attend, providing for the payment of tuition to private as well as public schools. Title 20–A M.R.S.A. § 2951(2), however, excludes sectarian schools from the choices available to the parents *solely* because of religious affiliation. *See* 20–A M.R.S.A. § 2951(2). Thus, the program is not neutral toward, but rather discriminates against, religion.

[¶ 75] The Equal Protection Clauses [38] prohibit disparate treatment of similarly situated persons. *See Nugent v. Town of Camden,*

36. The parents ask us, nonetheless, to assume that the next step in the Supreme Court's evaluation of states' efforts to provide innovation and flexibility in the delivery of education to the nations' children will be the approval of direct and unrestricted financial subsidies to religious schools. We decline to make that leap. Recognizing the difficulty that courts have encountered anticipating the Supreme Court's next step in the application of the Establishment Clause, Justice O'Connor admonished federal courts as follows:

We reaffirm that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Agostini,* 521 U.S. at 237, 117 S.Ct. 1997 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)).

37. The United States Constitution prevents any state from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend, XIV.

The Maine Constitution provides that "[n]o person shall ... be denied the equal protection of the laws ...." Me. Const. art. 1 § 6–A.

38. State and federal equal protection guarantees are co-extensive. *See School Admin. Dist. No. 1 v. Commissioner of Educ.,* 659 A.2d 854, 857 (Me. 1995).

1998 ME 92, ¶ 15, 710 A.2d 245, 249 (quoting *Wellman v. Department of Human Servs.,* 574 A.2d 879, 883 (Me.1990) ("The prohibition against denial of equal protection of the law to any person is implicated only when action by the state results in treatment of that person [that is] different than that given similarly situated individuals.")). The tuition program clearly results in disparate treatment. In towns without a public school system, parents who desire to send their children to sectarian private schools are treated differently from parents who choose nonreligious private schools. Tuition is paid only for those private schools that are nonsectarian.

[¶ 76] Despite the statute's blatant discrimination against religion, the Court finds no constitutional violation because, the Court concludes, making religious schools eligible for the tuition program would *itself* violate the Establishment Clause of the First Amendment to the United States Constitution.

[¶ 77] The Court concludes that including religious schools in the tuition program, *as it is presently constituted,* would probably result in noncompliance with Establishment Clause law. This is so because the tuition is paid directly to the schools and is substantial in amount, covering nearly the entire costs of the schools' programs. Moreover, the program, as presently designed, places few restrictions on the use of the money. The tuition could be used to benefit the religious as well as the secular educational aspects of the school. *See Columbia Union College v. Clarke,* 159 F.3d 151, 162 (4th Cir.1998).

[¶ 78] In my view, however, the analysis cannot end there. The Establishment Clause is not the only constitutional provision implicated in this challenge to Maine's education tuition statute. The parents also allege a violation of their right to equal protection of the law.

[¶ 79] Because the disparate treatment mandated by the statute is based on religion, implicating the most fundamental of the parents' constitutional rights, we must subject the statute to a strict scrutiny analysis. *See School Admin. Dist. No. 1,* 659 A.2d at 857; *Choroszy v. Tso,* 647 A.2d 803, 808 (Me.1994). The burden of justifying the discrimination is on the defendants. First, they must demonstrate that the classification excluding religious schools is justified by a compelling governmental interest. Second, they must show that the means chosen by the State to carry out the purpose of the program is narrowly tailored to the achievement of that goal. *See Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

[¶ 80] The stated goal of the tuition program is laudable. It gives parents in towns without public schools a wide choice of schools, public and private, for their children to attend, and it does so without running afoul of the Establishment Clause.[39] The means chosen by the State to achieve its goal, however, must be narrowly tailored to the accomplishment of that objective.[40] *See Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (a race-based classification necessary to further a compelling government interest is "within constitutional constraints if it satisfies the narrowly tailored test . . . set out in previous cases"). To determine whether a classification is "narrowly tailored," courts must consider "whether lawful alternative and less restrictive means could have been used." *Wygant,* 476 U.S. at 280 n. 6, 106 S.Ct. 1842 (citing Ely, *The Constitutionality of Reverse Discrimination,* 41 U. Chi. L. Rev. 723, 727, n. 26 (1974) (classification must "fit with greater precision than any alternative means")).[41] "Fundamentally,

---

39. School choice programs have great potential to improve our education system. *See* James A. Peyser, *Symposium: Issues in Education Law and Policy—School Choice: When, Not If,* 35 B.C. L. Rev. 619, 619–621 (1994). *See generally* Mark J. Beutler, *Public Funding of Sectarian Education: Establishment and Free Exercise Clause Implications,* 2 Geo. Mason Indep. L. Rev. 7 (1993).

40. There is no indication in equal protection jurisprudence that the strict scrutiny analysis for religious–based classifications differs from the analysis of race–based classifications.

41. *See also United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (considering "the necessity for the relief and the efficacy of alternative remedies" when determin-

narrow tailoring analysis asks whether a program is overinclusive or underinclusive to serve the purposes of the specific compelling interest on which the program is based." *Wessmann v. Gittens,* 160 F.3d 790, 828 (1st Cir.1998) (Lipez, J., dissenting). We must therefore ask if the *complete and total exclusion* of religious schools is necessary to accomplish the goal of the tuition program? *See Wygant,* 476 U.S. at 280, 106 S.Ct. 1842 (describing the means chosen by a State to accomplish its purpose under the strict scrutiny test). In my view, there is no need to totally exclude religious schools from the program in order to conform with the Establishment Clause.

[¶ 81] As the Court notes, in recent years, the Supreme Court has become less hostile to legislative attempts to provide aid to parents who choose to educate their children in religious schools. Recent cases demonstrate that aid programs that treat religion in a neutral fashion have been looked on favorably by both state courts and the Supreme Court. *See Kotterman v. Killian,* 193 Ariz. 273, 972 P.2d 606 (1999) (citing Supreme Court cases). *See also Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993); *Witters v. Washington Dept. of Serv. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). These cases reflect a change from what was perceived to be a hostility toward religion to a benign neutrality.[42]

[¶ 82] In *Agostini,* the Supreme Court reiterated that the issue in Establishment Clause cases is "whether the government acted with the purpose of advancing or inhibiting religion ... [and] whether the aid has the effect of advancing or inhibiting religion." 521 U.S. at 222–23, 117 S.Ct. 1997. The Supreme Court, however, acknowledged that it has "departed from the rule ... that all government aid that directly aids the educational function of religious schools is invalid." *Id.* at 225, 117 S.Ct. 1997.

[¶ 83] Several states have recently enacted programs to expand educational choices for parents. In Ohio, scholarships are provided to parents to send their children to private schools, including religious schools. *See Simmons–Harris v. Goff,* Nos. 96APE08–982, 96APE08–991, 1997 WL 217583 at *1 (Ohio Ct.App., May 1, 1997). In Wisconsin, state issued tuition vouchers allow low income parents to send their children to private schools, including religious schools. *See Jackson v. Benson,* 218 Wis.2d 835, 578 N.W.2d 602, 607–09 (1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 466, 142 L.Ed.2d 419 (1998). And in Arizona, persons donating to school tuition organizations are allowed a state tax credit of up to $500. *See Kotterman v. Killian,* 972 P.2d 606, 609–10 (Ariz. 1999).

[¶ 84] In my view, the recent evolution of Establishment Clause jurisprudence and the programs being enacted in several states make it clear that the total exclusion of religious schools from a tuition program providing aid to parents of children attending private as well as public schools is not essential. Establishment Clause violations may be avoided by a tuition program that does not entirely exclude religious schools, but provides more limited tuition with reasonable restrictions conditioning the use of that aid. In *Jackson v. Benson,* for example, the Wisconsin Supreme Court found no Establishment Clause violation in a tuition voucher program that provided substantial monetary aid to religious schools without restriction on how the aid was used because the program: selects its beneficiaries based on random,

---

ing whether a classification was narrowly tailored).

42. In his dissent in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), a case since overruled in *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), Chief Justice Berger characterized the Establishment Clause test for separation of church and state used in *Aguilar* as unacceptable. "Rather than showing the neutrality the Court boasts of ... [the test] exhibits nothing less than hostility toward religion and the children who attend church-sponsored schools." *Aguilar,* 473 U.S. at 420, 105 S.Ct. 3232 (Burger, C.J., dissenting).

nonreligious criteria; provides an "opt-out" provision that prevents private schools from requiring students to participate in religious activities; sends the economic aid to the religious school in the form of checks that must be endorsed by the parents; and limits the amount of tuition subsidy to the lesser of the Milwaukee Public School per student state aid or the private school's "operating and debt service cost per pupil." 578 N.W.2d at 609.

[¶ 85] A tuition program with similar or greater restrictions and conditions could be fashioned within the framework of the current statute with very little effort on the part of the State. Tuition in less substantial amounts could be authorized to benefit parents of children in religious schools. The tuition aid could be directed through the parents to avoid restrictions on direct aid and the State could require participating schools to accept an "opt-out" provision. In addition to the restrictions set forth in the Wisconsin program, the State could adopt reasonable conditions and restrictions on the use of the State aid, insuring that the moneys would not be used to directly subsidize the religious functions of the schools, avoiding both direct aid of religion and excessive entanglement of the State in religion. *See generally Mueller,* 463 U.S. at 396–403, 103 S.Ct. 3062.

[¶ 86] Although the legislature need not offer any aid to parents who choose private schools for their children, if such aid is provided, the Equal Protection Clause prohibits discrimination based on religion in a program providing such aid unless the discrimination is absolutely necessary to avoid Establishment Clause violations. In my view, the defendants cannot rely on the Establishment Clause to justify the present tuition program that blatantly discriminates on the basis of religion, when a more narrowly tailored tuition program could be created that would lessen the discrimination based on religion, while still complying with the Establishment Clause. The Establishment Clause prevents the government from establishing a church, passing laws "which aid one religion, aid all religions, or prefer one religion over another," or punishing individuals for professing particular religious beliefs. *Everson v. Board of Educ.,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947). It was not intended to provide States with a blanket justification for discriminating against religion.

[¶ 87] I would vacate the judgment of the Superior Court and remand to that court for further proceedings.