2000 ME 92

**Virginia GREEN**

v.

**COMMISSIONER OF MENTAL HEALTH AND MENTAL RETARDATION.**

Supreme Judicial Court of Maine.

Argued Jan. 5, 2000.

Decided May 17, 2000.

---

Peter Darvin (orally), Portland, for plaintiff.

Andrew Ketterer, Attorney General, William R. Stokes, Asst. Attorney General (orally), Augusta, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER and CALKINS, JJ.

DANA, J.

[¶ 1] Virginia Green appeals from the denial by the Superior Court (Kennebec County, *Atwood, J.*) of her petition for release from the Augusta Mental Health Institute (AMHI) and from the denial of her motion to alter or amend the court's judgment. Green was committed to AMHI on July 10, 1997, after she was found to be not criminally responsible by reason of mental disease or defect for the killing of her mother. On appeal, Green argues that the allocation of the burden of proof by clear and convincing evidence to insanity acquittees in release proceedings violates her right to substantive and procedural due process, as well as her right to equal protection. She also argues that the court erred as a matter of law when it applied the statutory criteria for release and that the court's findings of fact are

clearly erroneous. Because we find that the allocation of the burden of proof passes constitutional muster and because we find no error in the court's judgment, we affirm.

## I. FACTS

[¶ 2] On November 27, 1996, Virginia Green killed her mother while in a psychotic and delusional state. She was placed in AMHI in February 1997 pending the outcome of her trial. In July 1997, she was found not criminally responsible by reason of insanity and was automatically committed to AMHI pursuant to 15 M.R.S.A. § 103 (Supp.1999). In October 1997, Green filed a petition for release to a residential treatment program. A hearing was not held on her petition, however, until November 1998 because of various delays.

[¶ 3] Prior to the hearing, Green filed a trial memorandum challenging the placement of the burden of proof on her as a petitioner and requested that the burden be placed on the State to justify her continued commitment. The court denied her request citing our decision in *Taylor v. Commissioner of Mental Health and Mental Ret.*, 481 A.2d 139 (Me.1984), and ruled that the burden of proof rested with Green to show by clear and convincing evidence her eligibility for release.

[¶ 4] In addition to the testimony of Green herself, the evidence at the hearing consisted almost exclusively of testimony by experts regarding Green's mental health and her potential for dangerousness if released to a program like the one she proposed in her petition for release. It is undisputed that Green suffers from bipolar disorder, also known as manic depressive illness, and poly-substance abuse, which together are referred to as a dual diagnosis condition. It is also undisputed that her illness is incurable and will last a lifetime.

[¶ 5] Her treating psychiatrist at AMHI, Dr. Walter Christie, testified that she will always suffer from mental illness, but that she is currently asymptomatic. It was Dr. Christie who developed the transition plan that Green proposed to the court, as well as additional "steps" to the transition plan that were later provided at the court's request. Dr. Christie also testified that Green had a pattern of relapses and hospitalizations, indicating that she had been hospitalized fifteen to twenty times since 1972.

[¶ 6] Nevertheless, Dr. Christie opined that Green could safely be returned to the community without a likelihood of harm to herself or others as long as the proposed treatment plan was followed strictly. He was confident that Green could safely make the jump from being restricted to the grounds of AMHI to a residential treatment program. Dr. Christie observed that the combination of Green's substance abuse and her bipolar illness precipitated her mania that eventually evolved in psychosis and delusion. He testified that the events leading up to the death of her mother represented an extreme state for Green that could have been avoided with proper treatment and oversight like that provided for in the plan.

[¶ 7] Green testified that in the past she had used drugs and alcohol in an effort to self-medicate despite her awareness that they precipitated psychotic and delusional episodes, but that she would never again resort to those tactics because they had led to the death of her mother. Green did acknowledge, however, that her illnesses are prone to relapse.

[¶ 8] Dr. Prudence Baxter, a forensic psychiatrist, prepared an independent psychiatric examination of Green at AMHI's request and conducted a general review of Green's case. She concluded that Green was not an appropriate candidate for release from the hospital, even in a supervised living situation like the one proposed. She expressed concerns that much of Green's treatment at AMHI had been focussed on gaining discharge from the hospital and had not sufficiently explored why

Green's most recent episode of psychosis had resulted in such an extreme outcome. She was also concerned about Green's anti-anxiety medication that had highly addictive properties given her diagnosis of poly-substance abuse. Lastly, she indicated that she had not seen a residential treatment plan like the one proposed implemented in a forensic setting in the absence of any data regarding a candidate's responses to more incremental increases in privileges.

[¶ 9] Dr. Ann Bower, the clinical director for the Department of Mental Health, Mental Retardation and Substance Abuse Services, expressed similar concerns regarding the absence of demonstrable evidence that Green was ready for such a reduction in supervision. She indicated that such plans, known as "out-patient commitment plans," are rare in Maine because the State lacks an effective enforcement mechanism in the event of a breakdown in compliance. Dr. Bower also had concerns regarding analgesics that Green had been prescribed because of their addictive qualities.

[¶ 10] Following the testimony, the court issued an order in which it denied Green's petition for release, but noted that a higher level of privileges might be appropriate for Green. Green then filed a motion to amend the judgment, seeking an order granting off-grounds privileges. The State opposed the motion and submitted an institutional report recommending off-grounds privileges of a more circumscribed nature. The court denied Green's motion to amend the judgment and accepted the report's recommendation, approving the increased privileges it outlined including the more limited off-grounds privileges. Green then filed a notice of appeal.

## II. THE BURDEN OF PROOF

[¶ 11] If a defendant is determined to be not criminally responsible by reason of mental disease or defect pursuant to 17–A

M.R.S.A. § 39 (Supp.1999), the person is automatically committed to the custody of the Commissioner of Mental Health. *See* 15 M.R.S.A. § 103 (Supp.1999). Generally, the State must carry the burden beyond a reasonable doubt that the defendant engaged in conduct constituting a crime after which the burden shifts to the defendant to prove lack of criminal responsibility by reason of mental disease or defect by a preponderance of the evidence.[1] *See* 17–A M.R.S.A. §§ 39 & 40 (1983 & Supp.1999). The statute governing *release* of insanity acquittees, however, does not provide for a standard of proof, nor does it provide on whom the burden of proof rests. *See* 15 M.R.S.A. § 104–A (Supp.1999). As a result, we have been forced to make that determination in the past.

[¶ 12] In *State v. Shackford,* 262 A.2d 359 (Me.1970), we determined that the trial court had correctly placed the burden on the insanity acquittee to prove beyond a reasonable doubt that he was qualified for release into the community in a proceeding on a petition for release. *Id.* at 365–66. In 1984, we reconsidered our decision in *Shackford* and determined that, while the burden should continue to rest with the insanity acquittee, *see Taylor,* 481 A.2d at 144 n. 6, the degree of proof required should be clear and convincing evidence, *see id.* at 149. *Compare* 18 U.S.C.A. § 4243(d) (1985 & Supp.1999) (placing burden on insanity acquittees by clear and convincing evidence when underlying offense involved serious bodily injury or serious damage to property). We explicitly elected not to decide, however, the constitutionality of the required degree of proof, as the parties did not have an opportunity to brief the issue. *Id.* at 154. Green now asks us to address, *inter alia,* the constitutionality of placing the burden of proof on insanity acquittees by clear and convincing evidence in proceedings regarding petitions for release and to reconsider our holding in *Taylor.*

1. In this case, Green and the State reached a    plea agreement establishing these elements.

## A. Substantive Due Process

■ [¶ 13] Green argues that placing the burden on her to show by clear and convincing evidence that she is either no longer mentally ill or no longer harbors a potential for dangerousness violates her right to substantive due process provided by the Maine and United States Constitutions.[2] We conclude that placing such a burden on an insanity acquittee in release proceedings neither offends common concepts of ordered liberty, nor is such an arbitrary and wrongful government action that it violates either the Maine or United States constitutions.

■ The United States Supreme Court has stated:

Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking that direct and restrain our exposition of the Due Process Clause.

*Washington v. Glucksberg*, 521 U.S. 702, 720–721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotation marks and citations omitted). When a state infringes on one of these fundamental rights or liberties, the infringement must be narrowly tailored to serve a compelling government interest. *See id.* at 721, 117 S.Ct. 2258 (citation omitted). Additionally, the Court

has stated, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (internal quotation marks and citations omitted).

[¶ 14] Green relies heavily on *Foucha* for her proposition that the allocation and degree of proof in a release proceeding violates substantive due process. However, as the United States Supreme Court has admonished, we first must have a careful description of the asserted fundamental interest. In *Foucha*, an insanity acquittee challenged a Louisiana statute that allowed for the indefinite commitment of individuals who although dangerous, were no longer mentally ill. *Id.* at 73, 112 S.Ct. 1780. The Court determined that a statute that allowed for the indefinite confinement of an individual who the State *conceded* was no longer mentally ill simply because he could not prove that he was no longer a danger to society was the kind of arbitrary and wrongful government conduct that substantive due process protection guards against. *See id.* at 80–83, 112 S.Ct. 1780. In other words, individuals who are not mentally ill and who have not been found guilty of any crime have a fundamental interest in being free from indefinite confinement by the government and simply showing that they pose a danger to society is not a constitutionally sufficient justification for impinging on that fundamental interest. In this case, Green is merely challenging the allocation and standard of proof in a release proceeding, *not the basis for her confinement.*

■ [¶ 15] It is well established that the State may confine someone who is both mentally ill and who poses a danger to society. *See Jones v. United States*, 463

---

**2.** Because the due process protections of the Maine Constitution are coextensive with those of the United States Constitution, *see Fichter v. Board of Envtl. Protection*, 604 A.2d 433, 436 (Me.1992); *Penobscot Area Hous. Dev.*

*Corp. v. City of Brewer*, 434 A.2d 14, 24 n. 9 (Me.1981), all of Green's Maine due process claims will be analyzed concurrently with her federal due process claims.

U.S. 354, 370, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) ("when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society"). Green does not dispute that she may continue to be confined on that basis, rather she argues that *placing the burden on her* in a release proceeding to prove by clear and convincing evidence that one of these two requirements is no longer met violates a fundamental liberty interest.

[¶ 16] Green cites no authority, and we find none, that stands for the proposition that once an individual has been properly committed, that individual possesses a *substantive* due process right to be free from bearing the burden of proof in subsequent release proceedings. Again, we stress that Green is not arguing that her continued confinement is an arbitrary and wrongful governmental action; as someone who has been adjudged both mentally ill and dangerous, she does not possess a fundamental right to be free from confinement. Rather, she merely argues that the allocation of the burden of proof is arbitrary and wrongful government action. We do not agree, however, that placing the burden on an insanity acquittee in a release proceeding is somehow repugnant to our notion of ordered liberty; therefore, doing so does not violate Green's right to substantive due process.[3]

## B. Procedural Due Process

■ [¶ 17] Green also argues that the placement of the burden and degree of proof in release proceedings does not comport with her right to procedural due process. The first step in procedural due process analysis is to identify whether there is an interest to be protected. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Courts have generally determined that release proceedings implicate a liberty interest on the part of insanity acquittees. *See, e.g., United States v. Phelps,* 955 F.2d 1258, 1266 (9th Cir.1992) (holding that federal statute placing burden on insanity acquittees to prove eligibility for release did not violate due process), *cert. denied,* 504 U.S. 989, 112 S.Ct. 2977, 119 L.Ed.2d 595 (1992); *United States v. Wallace,* 845 F.2d 1471, 1473 (8th Cir.1988) (also holding statute did not violate procedural due process), *cert. denied,* 488 U.S. 845, 109 S.Ct. 121, 102 L.Ed.2d 94 (1988).

■ [¶ 18] Once a protected interest is established, that interest receives constitutionally required procedural protection. *See Vitek v. Jones,* 445 U.S. 480, 492, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). To determine whether a certain procedure comports with due process, courts look to three factors: the private interest affected,

3. In the context of her substantive due process challenge to the burden of proof, Green also argues that because she is asymptomatic, she is no longer "legally insane" and therefore has a substantive due process right not to bear the burden of proof at her release proceeding. However, the question of whether she is still mentally ill as defined by statute is one of the very questions to be answered at the release proceeding, and if she is no longer mentally ill as defined by statute, she is legally entitled to *release. See* 15 M.R.S.A. § 104–A(1) (Supp.1999); *LaDew v. Commissioner of Mental Health and Ret.,* 532 A.2d 1051, 1053 (Me.1987). Green cannot, however, assume the outcome of her release proceedings and then use the assumption as a premise in her argument that she should not have to bear the burden of proof in those proceedings. Additionally, at least one federal court in the context of a constitutional challenge to the *continued commitment* of an insanity acquittee who was asymptomatic has rejected the analogy between the individual in *Foucha* who was indisputably *not* mentally ill and individuals who are asymptomatic. *See United States v. Jackson,* 815 F.Supp. 195, 198–99 (N.D.Tex.1993) (rejecting argument that confinement cannot constitutionally continue when acquittee's illness was in remission because of treatment with medication), *aff'd,* 19 F.3d 1003 (5th Cir.1994), *cert. denied,* 513 U.S. 891, 115 S.Ct. 237, 130 L.Ed.2d 160 (1994).

the risk of error inhering in the procedure, and the government interest in the given procedure. *See Mathews*, 424 U.S. at 335, 96 S.Ct. 893. While courts have recognized the liberty interest at stake for the acquittee, i.e., avoiding continued confinement, *see Wallace*, 845 F.2d at 1474, the United States Supreme Court noted in *Jones* that insanity acquittees experience a diminished deprivation of liberty when compared to civil committees because they have already assumed the social stigma associated with commitment by raising the insanity defense themselves. *Jones*, 463 U.S. at 367, n. 16, 103 S.Ct. 3043.

■ [¶ 19] The Court also noted that, for purposes of initial automatic commitment of insanity acquittees, the finding beyond a reasonable doubt that the acquittee committed a crime is a sufficient indication of dangerousness and that an insanity acquittal supported an inference of continuing mental illness. *See id.* at 365–66, 103 S.Ct. 3043. The Court noted that this mitigated the risk of error generally, as compared to civil commitment proceedings, and that it eliminated altogether the risk that an individual was being confined merely for idiosyncratic behavior, a legitimate concern in the civil commitment context. *See id.* at 367, 103 S.Ct. 3043. Furthermore, continuing to place the burden on the acquittee regarding issues of mental health at release proceedings subsequent to commitment places the burden on the individual with the best ability to collect and present evidence on those matters. In addition, although an insanity acquittee certainly has an interest in avoiding erroneous continuation of confinement, the acquittee also has an interest in avoiding an erroneous release that may lead to personal harm and harm to others.

[¶ 20] Furthermore, the State clearly has an interest, for reasons of public safety, in avoiding erroneous release. *See*

*Wallace*, 845 F.2d at 1474 ("[T]he government's interest in preventing the premature release of persons who have already proven their dangerousness to society ... outweighs the interest in avoiding continued confinement of an acquittee."). This interest merits a heightened degree of proof for release. The State also has an interest in avoiding duplicative hearings in which issues established during the criminal phase leading up to commitment are relitigated, *see Jones*, 463 U.S. at 366, 103 S.Ct. 3043, and insanity acquittees have already gathered much of the relevant information by virtue of their carrying the original burden in the criminal proceedings. Placing the risk of error with the acquittee in release proceedings does not appear to strike an improper balance among these competing interests. *Cf. Benham v. Ledbetter*, 785 F.2d 1480, 1491–92 (11th Cir.1986). Therefore, the placement and the degree of the burden of proof does not violate procedural due process.

## C. Equal Protection

[¶ 21] Green argues that the disparity in the allocation and degree of proof at release proceedings for civil committees and those for insanity acquittees violates her right to equal protection guaranteed by the Maine and United States Constitutions.[4] We have noted previously, "[i]f a challenged statute involves neither a fundamental right nor a suspect class, different treatment accorded to similarly situated persons need only be rationally related to a legitimate state interest." *See School Admin. Dist. No. 1*, 659 A.2d at 857; *see also FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (noting that in areas of social policy, if neither a fundamental right nor suspect class is involved, a classification must be upheld if there is "any reasonably conceivable state of facts that

4. Similar to the due process clauses of the Maine and United States constitutions, the equal protection clauses found in the state and federal constitutions offer coextensive protections. *See School Admin. Dist. No. 1 v. Commissioner, Dep't of Educ.*, 659 A.2d 854, 857 (Me.1995); *Choroszy v. Tso*, 647 A.2d 803, 808 (Me.1994).

could provide a rational basis for the classification").

[¶ 22] Allocating the burden of proof to insanity acquittees by clear and convincing evidence in release proceedings, while not doing so to civil committees, does not impinge on a fundamental right, nor are insanity acquittees considered members of a suspect classification, therefore, strict scrutiny does not apply. Rather, we must determine whether similarly situated individuals are being treated differently and whether there is a rational basis for it. *See City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). There is a good argument that insanity acquittees and individuals civilly committed are not similarly situated for purposes of equal protection analysis because of the difference in circumstances giving rise to their commitment, *see, e.g., Glatz v. Kort,* 807 F.2d 1514, 1522 (10th Cir.1986); *Hartman v. Summers,* 878 F.Supp. 1335, 1346 (D.C.Cal.1995). As the United States Supreme Court noted in *Jones,* there is a "widely and reasonably held view that insanity acquittees constitute a special class that should be treated differently ...." *Jones,* 463 U.S. at 370, 103 S.Ct. 3043. Even if we assume, however, that they are similarly situated there is a rational basis to justify the differing procedures at their respective release proceedings.

[¶ 23] Insanity acquittees have previously demonstrated their dangerousness to the community. The danger posed by civil committees is more speculative. This distinction does not change once commitment has taken place. As a result, insanity acquittees pose an increased risk to society once they are released and this provides a rational basis for the disparity in treatment. *Cf. Francis S. v. Stone,* 995 F.Supp. 368, 385 (S.D.N.Y.1998). Therefore, the release procedures for insanity acquittees do not violate their right to the equal protection of the law.

[¶ 24] Because the placement and the degree of the burden of proof in release proceedings do not violate insanity acquittees' rights to due process and equal protection, we conclude that our ruling in *Taylor* is constitutionally sound. Therefore, our decision in that case will remain undisturbed. The Superior Court properly adhered to *Taylor* in the hearing on Green's petition for release.

## III. GREEN'S RELEASE HEARING

### A. The Governing Statute

[¶ 25] With respect to the release proceedings themselves, Green argues that the court misinterpreted the statutory requirements for release when it determined that because she was still diagnosed with a mental illness and still posed a likelihood of danger to the community, she was not eligible for release. She argues that the statute requires that an insanity acquittee's illness be symptomatic in order to continue commitment, and that if the illness is no longer symptomatic, the statute requires release.

[¶ 26] Statutory interpretation is a question of law and we review such questions de novo. *See Passamaquoddy Water Dist. v. City of Eastport,* 1998 ME 94, ¶ 1, 710 A.2d 897, 899. The statutory provision governing release and discharge of insanity acquittees provides in relevant part:

> If, after hearing, the court finds that the person may be released or discharged *without likelihood that the person will cause injury to that person or others due to mental disease or mental defect,* the court shall order as applicable ... [r]elease from the institution, provided that ... [t]he order for release may include conditions deemed appropriate by the court ....

15 M.R.S.A. § 104–A(1)(A) (Supp.1999) (emphasis added). As we noted in *LaDew v. Commissioner of Mental Health and Mental Retardation,* the provisions of the Criminal Code regarding the insanity defense must be read and applied as an

integrated whole with those of Title 15 regarding the release of insanity acquittees. *See LaDew*, 532 A.2d at 1053.

[¶ 27] Because the release provisions provide no definition of "mental disease or defect," we look to the Criminal Code which provides the following definition: " 'mental disease or defect' means only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality." 17–A M.R.S.A. § 39(2) (Supp.1999). We stated in *LaDew* that "to be released under 15 M.R.S.A. § 104–A [an insanity] acquittee must show ... that the mental disease or defect by reason of which he was relieved of criminal responsibility *no longer exists,* or at least *no longer poses a danger* to himself or others if he is released." *LaDew,* 532 A.2d at 1053; *see also Roberts v. Commissioner of Mental Health and Ret.,* 562 A.2d 680, 683 (Me. 1989). In other words, if an insanity acquittee can show (1) that he or she is no longer mentally ill, *cf. Foucha,* 504 U.S. at 76, n. 4, 112 S.Ct. 1780, *or* (2) that he or she is no longer a danger, although *still* mentally ill, a court may order release.

[¶ 28] Although demonstrating that a mental illness is asymptomatic or that the insanity acquittee is no longer in the same state as existed at the time of the acquittee's crime may indicate that there is little likelihood of dangerousness, it does not mean that the mental "disease or defect" *no longer exists. Cf. Parrish v. Colorado,* 78 F.3d 1473, 1477 (10th Cir.1996) ("The crux of the issue, then, is not whether the acquittee must be ill in the medical sense, but whether his mental state fits a constitutionally valid legal definition."). Otherwise, an acquittee would be statutorily entitled to release as soon as his or her condition was brought under control by medication. That is clearly not what the statutory scheme contemplates. In fact, we noted in *LaDew* that the statutory scheme governing the insanity defense had been tightened in response to a public concern that insanity acquittees were "too

quickly being released and too quickly gaining complete discharge." *LaDew*, 532 A.2d at 1053 (citing *Report of the Insanity Defense and Related Statutes and Procedures Study Subcommittee of the Joint Standing Committee on the Judiciary* 15– 16, 18–19 (1986)). Being asymptomatic is not equivalent to no longer suffering from the mental illness that served as the basis for acquittal and therefore being asymptomatic does not automatically entitle an acquittee to release pursuant to the statutory scheme.

[¶ 29] The trial court in this case denied Green's request for relief based on its finding that (1) Green still suffers from mental illness that will be life-long, although she is currently stable because of her regimen of medication, and (2) at the present time she could not be released without the likelihood of danger to herself or others. In other words, the mental condition that impaired Green's perception of reality when she killed her mother, i.e., the dual diagnosis of her bipolar and polysubstance abuse illnesses, still existed, and that condition still created the potential for danger at the time of the hearing. Thus, the court did not err as a matter of law by denying Green release based on these factual determinations.

**B. The Court's Factual Findings**

[¶ 30] In Green's last challenge to the court's judgment she argues that there is insufficient evidence to support the court's findings of fact. We review findings of fact for clear error and will reverse a finding of fact only when:

(1) there is no competent evidence in the record to support it, or (2) it is based upon a clear misapprehension by the trial court of the meaning of the evidence, or (3) the force and effect of the evidence, taken as a total entity, rationally persuades to a certainty that the finding is so against the great preponderance of the believable evidence that it does not represent the truth and right of the case.

*State v. Landry,* 600 A.2d 101, 103 (Me. 1991) (citing *Harmon v. Emerson,* 425 A.2d 978, 982 (Me.1981)); *see also LaDew,* 532 A.2d at 1054 ("we must affirm unless the record evidence compelled the Superior Court to make a finding in favor of the party with the burden of proof.").

[¶ 31] We have previously noted, "[w]hether [the insanity acquittee] suffer[s] from a mental disease or defect is ultimately a legal, as opposed to a medical, determination to be made by the court." *Roberts,* 562 A.2d at 683. All of the experts testified that Green suffered from bipolar and poly-substance abuse disorders that were life-long illnesses. The court ultimately found that Green was dually-diagnosed and controlled her illnesses through a strong regimen of medications. Although Green had not suffered the symptoms of psychosis, delusions, mania or depression for a period of months, the court was not compelled to find that she no longer suffered from a mental illness. *Compare Kansas v. Hendricks,* 521 U.S. 346, 359, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ("[T]he term 'mental illness' is devoid of any talismanic significance. Not only do 'psychiatrists disagree widely ... on what constitutes mental illness,' but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement.") (citations omitted).

[¶ 32] With respect to the likelihood of dangerousness, again the court had before it evidence that the symptoms of Green's bipolar illness were controlled by strong medications some of which had addictive properties and might present problems with respect to her poly-substance abuse disorder. The testimony of all of the witnesses, including Green herself, indicated a long history of relapses and hospitalizations, often precipitated by the abuse of substances, licit and illicit. Several of the witnesses expressed concern over the lack of data regarding any attempts at a more gradual reintroduction of Green in the community setting. In other words, there was no precedent in Green's treatment history subsequent to her killing her mother for establishing Green's risk of dangerousness off the ground of AMHI. The record evidence at this stage in Green's treatment did not compel a finding by the court that Green presented no likelihood of danger to herself and others.[5]

[¶ 33] Because there is competent evidence in the record supporting the court's factual findings, we find no error. Furthermore, the court correctly interpreted the statute governing release. Finally, as discussed above, our holding in *Taylor* regarding the burden of proof in release proceedings does not offend constitutional principles of fairness and justice.

The entry is:

Judgment affirmed.

5. Green also argues that the court abdicated its responsibility by not adding additional conditions to the proposed release plan pursuant to 15 M.R.S.A. § 104-A(1)(A) to allay its concerns regarding Green's potential for dangerousness. Because, however, the court determined that Green still suffered from a mental illness and could not be released, i.e., returned to *permanent* residency within the community, without the likelihood of injury to herself or others, release was not authorized by section 104-A(1), with or without additional conditions to those proposed by Green. Additionally, the court *did* approve the modified release treatment plan pursuant to section 104-A(2) recommended in the institutional report. This plan does allow for travel by Green off the ground of AMHI and in the community, but in a more measured way and with greater supervision than that proposed by Green. Therefore, the court clearly met its statutory responsibility, as it ultimately adopted a treatment plan that provided for interaction with the community, but with safeguards it implicitly deemed appropriate.