STATE OF MAINE
CUMBERLAND, SS

STATE OF MAINE
CUMBERLAND, SS
CLERK'S OFFICE

2007 FEB -6 P 1: 19

SUPERIOR COURT
CIVIL ACTION
DOCKET CV-04-720

E. PERRY IRON & METAL CO, INC.,

Plaintiff

v.

**DECISION AND JUDGMENT**

CITY OF PORTLAND,

Defendant

DONALD L. GARBRECHT
LAW LIBRARY

MAY 15 2007

## I.    BACKGROUND

This is the second phase of a Rule 80B appeal and an independent claim by E. Perry Iron & Metal Company ("Perry") stemming from the non-renewal of plaintiff's junkyard permit by the City of Portland ("City").

Perry has operated a scrap metal recycling business facility in the same location since 1936. Perry annually applied for a junkyard permit from the city. On September 24, 2004, Perry received an application for renewal of its permit for the calendar year 2005 that contained a filing deadline of November 15, 2004. Perry filed its application on September 28, 2004. On December 1, 2004, Perry received a letter from the City stating that its application would be acted on at the next city council meeting. The City's licensing office placed a draft order approving Perry's application in plaintiff's file and acted in a manner consistent with the intent to renew Perry's application.

At the same time, the City was drafting a new scrap metal recycling facility ordinance ("SMRF") to specifically license these type facilities. The draft ordinance had received its first reading in front of the council several months previous in June 2004. It provided: (1) that no scrap metal recycling facility would be issued unless the

provisions of the ordinance are met; and (2) licenses are to be renewed by January 1st of any given year, with the completed application to be filed 90 days before that time, at the beginning of October.

After further discussion in committee, the city council took up the matter of the ordinance on September 8, 2004. During the time for public comment, Perry, through its counsel, objected to the ordinance's passage. Ultimately, that day the council enacted the ordinance, which would apply to all scrap metal recycling facilities doing business in Portland; however, the ordinance did not take effect until October 8, 2004, and it did not include regulations to determine compliance with the ordinance.

On December 9, 2004, Perry received a letter from the City's corporate counsel stating that the it was planning to review and take action on the proposed regulations that were being drafted pursuant to the SMRF ordinance. The letter also stated that there would be a transitional period to give businesses impacted by the ordinance time to come into compliance. The City never took action on Perry's junkyard application.

Regulations were approved by the city council on January 3, 2005, which included a transitional provision giving businesses until February 18, 2005 to file an application under the SMRF ordinance and requiring compliance by April 1, 2005. Perry has not filed an application for a scrap metal recycling permit under the new ordinance.

## II. PROCEDURAL HISTORY

Perry filed a complaint on December 1, 2004[1] and later obtained an Order for an emergency stay allowing the plaintiff to continue operating without complying with the ordinance.

---

[1] Perry subsequently amended the complaint simultaneous with the filing of the City's answer

In the 80B appeal, Perry asked the court to declare that the ordinance was inapplicable to plaintiff when enacted in October 2004 as applied to 2005 and to order the City to renew Perry's license on January 1, 2005. Perry's argument was based on the City's failure to act on the license application and for retroactively applying the new ordinance's licensure procedures.

On March 31, 2005, this court issued a decision stating that the City should have acted on Perry's license application, that the ordinance could not be retroactively applied to Perry's 2004 application, and that Perry was entitled to have its permit renewed on January 1, 2004 through September 30, 2006 based on 30-A M.R.S.A. § 3753. The court did not rule on the ordinance's validity and applicability to the plaintiff after its application expired on September 30, 2006.[2] The City's appeal to the Law Court was dismissed as interlocutory.[3]

After a period of discovery, the parties agreed that a trial of the facts was unnecessary, that court could consider all the exhibits submitted as part of the record, subject to relevance objections. After oral argument, the parties submitted supplemental briefs.[4]

## III. FINDINGS OF FACT

After review of the record, the court makes the following findings of fact:

---

[2] By agreement of the parties and the court, the 80B appeal (Count II) and the challenge to the validity of the ordinance (Count I) were bifurcated. Because of licensing issues for 2005 under the old ordinance, bifrucation allowed those issued to be litigated first.

[3] E. Perry Iron & Metal Co. Inc. v. City of Portland, 2006 ME 52, 896 A.2d 956.

[4] Prior to entering judgment, the court, sua sponte, inquired whether the plaintiff had notified the attorney general of its challenge to the constitutionality of the City's SMRF ordinance as required by 14 M.R.S.A. § 5963. Notice was thereafter provided and the attorney general's office provided written notice to the court that it declined to participate.

3

1. The city of Portland intends to redevelop the Bayside area of the city. R.I at 3, p. 2.[5]

2. Perry is located in the Bayside area of the city. R.I at 1, p. 1.

3. The redevelopment plan requires that Perry's scrap metal recycling facility be relocated. R.I at 8, p. 10 & 22.

4. The SMRF ordinance was first drafted in 2002 for the purpose of imposing stricter environmental protection standards on facilities handling scrap metal. R.I at 15, p. 1-2, R.II at 71 pp. 62-63 & R.II at 75 p. 28, ll. 16-21.

5. The SMRF will impose an onerous financial burden on the facilities that fall within the ordinance's parameters. R. at 77, p.42, ll. 17-20.

6. In 2002, the city sent letters to five businesses that were potentially impacted by the SMRF ordinance. R.II at 76, exs. 12-16.

7. In 2004, the city sent two letters to Perry and another scrap metal recycling facility concerning the ordinance. R.II at 52-53.

8. The individual in charge of ensuring facilities comply with the SMRF ordinance, believes three facilities within the city fall under the parameters of the ordinance. R.II at 75, p.19, ll. 3-8.

9. None of the three facilities identified by the individual in charge of compliance with the SMRF ordinance had sought or obtained a license as of June 15, 2005. R.II at 75, p. 19, ll 9-12.

10. All three of the facilities that the director had identified as falling within the parameters of the ordinance were working with the city to come into compliance with the ordinance. R.II at 75, pp. 19-23.

11. Perry sought and obtained junkyard licenses since 1986. R. at 1.

12. Perry is in the business of recycling scrap metal. Perry is open to the public and takes in ferrous and nonferrous metal. The metal is boxed or baled and then shipped. R.II at 75, p.6, ll. 6-10 & pp. 28-29.

13. Perry handles batteries, which are subject to special disposal rules under federal law. R.11 at 75, p.28, ll. 17-21.

---

[5] The parties submitted three separate bound volumes that constitute the Record with multiple tabs containing identical labels. For the purposes of clarity, the first volume submitted, entitled "Record" and docketed on June 20, 2005, is hereinafter referred to as "R." The second submission docketed on October 14, 2005 contains two volumes, entitled "Record Volume I" which hereinafter is referred to as "R.I," and "Record Volume II" which hereinafter is referred to as "R.II."

14. Batteries contain some waste products, which are designated hazardous. R.II at 71, p. 62-63.

15. Perry did not allow the city to conduct environmental testing on its property and has not disclosed the results of environmental tests that it had conducted on its property as of June 15, 2005. R.II at 75, p.25-26 & R.II at 71 p. 27, ll 18-21.

16. The area where Perry is presently located requires environmental remediation. R.I at 7, pp. 1-2 & R. at 2, p. 5-2.

## IV. DISCUSSION

Judgment on Count II of Perry's complaint containing the 80B appeal was decided by the court's Decision and Order of March 31, 2005. The only matter remaining for resolution are the issues in Count I challenging the constitutionality of the ordinance and seeking declaratory judgment that the ordinance is void.

Perry offers five challenges to the SMRF ordinances validity: (1) that the ordinance is preempted by State solid waste and hazardous waste regulation; (2) that the statute violates Perry's equal protection rights either because the ordinance is designed to target Perry or because of the manner in which the City has selectively enforced the ordinance; (3) the ordinance violates Perry's due process rights because the object and manner of the ordinance is inappropriate and arbitrary; (4) the ordinance effectuates an unauthorized taking of Perry's property; and, (5) the ordinance violates the commerce clause.

## A. PREEMPTION[6]

### 1. Standard of Review

The standard for preemption of a municipal ordinance by State law is "[t]he Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law." 30-A M.R.S.A. § 3001(3)(2005). Action by municipalities is "preempted only where application of the municipal ordinance prevents the efficient accomplishment of a defined state purpose. . . . [A]ction under a municipal ordinance will be preempted only when state law is interpreted to 'create a comprehensive and exclusive regulatory scheme' inconsistent with the local action." *Sawyer Environmental Recovery Facilities, Inc., v. Town of Hampden et al.*, 2000 ME 179, ¶ 27; 760 A.2d 257, 264 (internal citations omitted). A comprehensive and exclusive regulatory scheme that preempts municipal action is one that "manifest[s] a clear legislative intention to remove any authority a municipality may have." *Midcoast Disposal, Inc. v. Town of Union*, 537 A.2d 1149, 1151 (Me. 1988).

Home Rule is granted to municipalities by the Maine Constitution, art. VIII, pt. 2, § 1 and the legislature has defined Home Rule "as a delegation to the municipalities of authority to exercise any power or function that the Legislature has power to confer upon them, and that 'is not denied either expressly or by clear implication.' " *Central*

---

[6] Perry devoted four lines in his extensive brief arguing that the statute's time limits are inconsistent with State law, specifically that the SMRF Ordinance § 31-6(c) mandated that licenses be renewed from January 1 and 30-A M.R.S.A. §3753 mandates that license be issued on October 1. The ordinance in the record at R.II at 66 does contain the January 1 requirement; however, the present version of the ordinance, found at http://www.ci.portland.me.us/citycode.htm, has corrected the timing issue as to the day the permit should be issued. An issue not raised by Perry is the § 3753 mandate that permits be valid for 5 years and the SMRF ordinance is renewable annually or tri-annually with approval.
  (The court feels compelled to note that Perry filed a 42 page brief with supplements beyond the material contained in the record. The brief was filed without the prior authorization of the court as required by M.R.Civ.P. 7(f).

*Maine Power Co., Town of Lebanon*, 571 A.2d 1189, 1193 (Me. 1990) (citing 30-A M.R.S.A § 3001 (Supp. 1988)).[7] There exists "a rebuttable presumption that any ordinance enacted under this section is a valid exercise of a municipality's home rule authority." 30-A M.R.S.A. § 3001(2) (2005).

Given the presumption of validity enjoyed by the SMRF ordinance, unless there is a clear intent by the legislature to deprive municipalities of the authority to pass an ordinance regulating scrap metal recycling facilities, the SMRF ordinance is valid.

## 2. Discussion

The Maine Legislature enacted an entire subchapter of the Maine Revised Statutes devoted to junkyards and automobile graveyards. The statute's stated purpose includes the following:

> "Junkyards, automobile graveyards and automobile recycling businesses pose potential risks to the environment, particularly to groundwater and surface water quality if gasoline, oil or other fluids are not managed and disposed of properly. Proper location and operation of these facilities are critical to ensure protection of groundwater and surface water quality, other natural resources and the health and welfare of Maine citizens. These facilities may create nuisance conditions potentially affecting abutting landowners and others if not located and operated properly. For these reasons, it is declared that these facilities are appropriately subject to certain environmental and operational standards and to appropriate municipal and state regulation.

30-A M.R.S. § 3751 (2005).[8] The statutory definition of a junkyard is an "outside area used to store, dismantle or otherwise handle. . . junked plumbing, heating supplies, electronic or industrial equipment, household appliances or furniture . . . old or scrap copper, brass, rope, rags, batteries, paper trash, rubber debris, waste and all scrap iron, steel and other scrap ferrous or nonferrous material." 30-A M.R.S. § 3752 (2005).

---

[7] While the citation is an older version of the statute, 30-A M.R.S. § 3001(2005) contains identical language.
[8] 30-A M.R.S. 3751-3754-A govern junkyards and underwent revisions in 2003 and 2005, but the language cited has not changed during the pendency of this case.

Individuals who wish to operate an automobile recycling business, automobile graveyard, or junkyard must first obtain a permit from the municipality where the operation is to occur. 30-A M.R.S. § 3753 (2005). The statute requires that permits be valid for five years and beginning on October 1. *Id.*[9] The current permitting limitations imposed by the legislature are found in 30-A M.R.S. § 3754 and include various site and operation requirements, including the following provision:

> This subchapter may not be construed to limit a municipality's home rule authority to enact ordinances with respect to automobile graveyards, automobile recycling businesses and junkyards that the municipality determines reasonable, including but not limited to ordinances concerning: (A) Compliance with state and federal solid waste and hazardous waste regulations; . . . (E) The effect on groundwater and surface water, as long as municipal ordinances on groundwater are *no less stringent* than or inconsistent with rules adopted by the Department of Environmental Protection; and Best management practices. . . developed by the Department of Environmental Protection.

30-A M.R.S. § 3754(7) (emphasis added).

The legislature has also passed a separate regulatory scheme pertaining to waste management and solid waste facilities. The definition of solid waste is "useless, unwanted or discarded solid material. . . including, . . . garbage, refuse-derived fuel, scrap materials, junk[.] . . . The fact that a solid waste or constituent of the waste may have value or other use or may be sold or exchanged does not exclude it from this definition." 38 M.R.S. § 1303-C(29) (2005). A solid waste disposal facility is defined as a "facility for the incineration or landfilling of solid waste or refuse-derived fuel." 38 M.R.S. § 1303-C(30) (2005). A solid waste landfill is defined as "a waste disposal facility for the disposal of solid waste on or in land." 38 M.R.S. § 1303(32) (2005). Approval from the Department of Environmental Protection is required to operate a

---

[9] In 2004, the statute changed the time period for permits which had started on January 1 to October 1.

solid waste facility. 38 M.R.S. § 1310-N (2005). The legislature limited the ability of municipalities concerning solid waste management, specifically:

> Municipalities are *prohibited from enacting stricter standards than those contained in this chapter* and in the solid waste management rules adopted pursuant to this chapter governing hydrogeological criteria for siting or designing solid waste disposal facilities or governing the engineering criteria related to waste handling and disposal areas of a solid waste disposal facility . . . municipalities, except as provided in this section, may enact ordinances with respect to solid waste facilities that contain standards the municipality finds reasonable, including, without limitation, conformance with federal and state solid waste rules; . . . ground water protection; surface water protection; . . . and compatibility of the solid waste facility with local zoning and land us controls, provided that the standards are not more strict than those contained in this chapter.

38 M.R.S. §1310-U (2005) (emphasis added).

Construing terms in a statute is a question of law. *Butler, v. Killoran, et al.*, 1998 ME 147; ¶ 5, 714 A.2d 129, 132. After looking at the plain meaning of an ordinance, terms in an ordinance should be reasonably interpreted, consistent with the intent and overall structure of the statute. *Logan v. City of Biddeford*, 2006 ME 102, ¶ 8; 905 A.2d 293, 295. The Law Court has recognized that when statutes are unable to be harmonized, "a statute dealing with a subject specifically prevails over another statute dealing with the same subject generally." *Butler*, 1998 ME 147; ¶ 11, 714 A.2d at 133.

In order to prevail, Perry must overcome the presumption that the ordinance is a valid use of the city's Home Rule authority. Perry argues that the state's junkyard and automobile graveyard statutes implicitly preempt the SMRF ordinance because it goes beyond state and federal law and the ordinance is explicitly preempted by the state's waste management and solid waste facilities regulations. Perry has previously complied with the city's licensure provisions for junkyards and automobile graveyards. It has sought and obtained a junkyard license from the city of Portland since as early as 1986. R. 1. The junkyard and automobile graveyard statutes do not create a

comprehensive and exclusive scheme that clearly removes authority from the city. To the contrary, the legislature explicitly authorizes municipal ordinances by stating that, "the subchapter may not be construed to limit a municipalities home rule authority to enact ordinances." 30-A M.R.S. §3754(7). The statute also explicitly authorizes municipalities to pass ordinances on the basis of compliance with state and federal solid and hazardous waste regulations and the effect on ground and surface water. The only requirements are that the ordinances adopt, as a threshold, rules promulgated by the Department of Environmental Protection and that the ordinances do not conflict with Department of Environmental Protection rules. The statute by its own terms necessitates rather then preempts municipal action by mandating that license be obtained from the municipalities.

There is no evidence in the record that Perry has ever complied with or attempted to comply with the waste managements and solid waste facilities' regulations. Even so, Perry claims that the waste management and solid waste facilities regulations explicitly prevent the city from passing the SMRF ordinance. Perry relies on 38 M.R.S. § 1310-U which authorizes municipalities to pass ordinances concerning compliance with state and federal solid waste rules and ground water protection, so long as the standards are not stricter than those contained in chapter 38. Contrary to Perry's claim, there is no explicit preemption contained in the waste management and solid waste facilities regulations. If the SMRF ordinance falls within the auspice of chapter 38 and contains stricter standards than contained in the chapter, the ordinance would be invalid because it contradicts the statute. However, if the SMRF ordinance falls solely within the junkyard and automobile graveyard licensure scheme it is likely a valid use of municipal Home Rule authority.

The definition of solid waste facility is broad but clearly applies to landfills and facilities that incinerate waste, places which serve as a final disposal site for unwanted, non-liquid materials. The junkyard statute applies to outside areas used to "store, dismantle or otherwise handle. . . scrap iron, steel and other scrap ferrous or nonferrous material." 30-A M.R.S. § 3751 (2005). It is conceivable that a property could be used for multiple purposes bringing it under the ambit of both laws. Here, however, Perry does not fit the definition for a solid waste facility, the record does not demonstrate that Perry either incinerates or landfills waste. Rather, Perry is a scrap metal recycling business that takes in ferrous and non-ferrous metals. R.II at 7, p. 6, ll 6-10. Perry also processes and ships out the metal and other byproducts of the operation such as batteries. R.II at 7, pp. 28-29. This is consistent with the junkyard and automobile graveyard statute definition and inconsistent with the definition of a solid waste facility.

The SMRF ordinance applies to "all scrap metal recycling facilities, as defined by this ordinance." R. 66, Portland, Me., Code of Ordinances § 31-3. The ordinance defines scrap metal recycling facilities as:

> an area used to receive, process, or store any form of metal that is already scrap for recycling or reuse and which handles, removes, or disposes of waste as part of the processing. This definition shall include an automobile recycling facility as defined in 30-A M.R.S.A. § 3752 (1-A). The definition shall not include a transfer states licensed by the state.

*Id.* at § 31-4. The ordinance applies to Perry's operation and may apply to other operations that would fall within the jurisdiction of the junkyard and automobile graveyard statute. Given the legislature's statement that such "facilities are appropriately subject to certain environmental and operational standards and to appropriate municipal and state regulation," the city's SMRF ordinance is neither explicitly nor implicitly preempted by state law.

11

## B. EQUAL PROTECTION

### 1. Standard of Review

Denial of "the equal protection of the laws" to any person is prohibited under the Maine and United States Constitutions and requires similarly situated persons be treated similarly. U.S. Const. amend. XIV, §1; Me. Const. art. I, §6-A, *Bagley et al. v. Raymond School Dep't et al.*, 1999 ME 60, ¶ 23; 728 A.2d 127, 136. The Maine Constitution is coextensive with the United States constitution. *Green. V. Comm'r of Mental Health & Mental Retardation*, 2000 ME 92, ¶ 21 n.4, 750 A.2d 1265, 1272. It is well settled that ordinances enjoy a presumption of constitutionality. *Ferraiolo Construction Co., INC., v. Town of Woolwich*, 1998 ME 179, ¶ 9, 714 A.2d 814, 817.

The Supreme Court has stated that "'the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)(citations omitted). "If a challenged statute does not involve either a fundamental right or a suspect class, 'different treatment accorded to similarly situated persons need only be rationally related to a legitimate state interest.'" *School Admin. Dist. No. 1 v. Comm'r, Dep't of Ed.*, 659 A.2d 854, 857 (Me. 1995). Furthermore, "the party challenging the statute has the burden of proving that no conceivable state of facts exists to support the legislative action." *Id.* "When a statute is reviewed under the rational basis standard, it bears a strong presumption of validity." *Bagley*, 1999 ME 60, ¶ 28; 728 A.2d at 137.

The SMRF ordinance will be upheld as long as there are conceivable facts that support the passage of the ordinance and the ordinance is rationally related to a legitimate state interest. Perry asserts that the City passed the ordinance for the

purpose of gaining the upper hand in negotiations in which the it was attempting to relocate Perry and redevelop the Bayside area. While this may well be one of the City's intentions, there are other facts that support to ordinance's passage.

The ordinance was written in response to environmental concerns and one of the purposes of the statute is to impose stricter environmental regulations on scrap metal facilities. *Id.* & R.I at 41. This is born out by the requirements of the ordinance, which require testing of the soil and groundwater in the vicinity of the facility. Portland, Me. Code of Ordinances § 31-7(g-h). Perry has not overcome the presumption that the ordinance is valid. Protecting the environment is a legitimate municipal goal and the ordinance conceivably furthers the City's ability to protect the environment by requiring scrap metal facilities to test their environmental impact and report the results to the City.

### 2. Impermissible Targeting

"It is inescapable that many municipal ordinances disadvantage some individuals. . . . If the legislation is reasonably suited to serve a proper purpose, a court will not nullify it because it works hardship and disadvantage in individual cases." *Von Tiling v. City of Portland*, 268 A.2d 888, 892-893 (Me. 1970). "To prove that the Ordinance violates the equal protection clause of the federal and state constitutions by reason of an illegal classification, the Club must show 'by clear and irrefutable evidence its arbitrariness and irrationally discriminatory nature.'" *Danish Health Club, Inc. v. Kittery* 562 A2d 663, 665 (Me. 1989)(citations omitted).

Perry argues that the City's SMRF ordinance specifically targets Perry. Perry relies on the fact that the city is attempting to negotiate a relocation of the Perry facility as proof that the ordinance is arbitrary and irrationally discriminatory. Perry characterizes the ordinance as a threat used to force Perry to capitulate to the City's

demands that Perry relocate so that the City can redevelop the Bayside area where Perry is located. Perry asserts that ordinance is irrational because it claims the City does not regulate other business that produce hazardous waste. Perry acknowledges that it handles waste, such as batteries, that require special handling pursuant to federal guidelines and that contain materials, which are considered hazardous. R.II at 75, p. 28, ll. 16-21 and R.II at 71, p. 62-63. The City has performed environmental testing that provides evidence that the area where Perry is located requires environmental remediation. R.I at 7, pp. 1-2 & R.I at 2, p. 5-2. Perry has not cooperated with the City's attempt to conduct environmental testing on Perry's property or to release results from environmental testing that may Perry conducted, which would provide evidence that the City's environmental concerns are irrational and unwarranted and the ordinance is without merit. R.II at 75, p.25-26 & R.II at 71 p. 27, ll 18-21.

The City is appropriately concerned with the environmental effect of businesses that operate within the City. The legislature requires municipalities to regulate junkyards and automobile graveyards, like Perry's facility, and has stressed that such operations are properly the target of regulations seeking to protect the environment. *See supra*, 30-A M.R.S.A. §3751 (2005). Perry has failed to offer clear or irrefutable evidence that the ordinance is either arbitrary or that it irrationally discriminates.

### 3. Discriminatory Enforcement

"In order to establish a constitutional equal protection violation based on selective prosecution or selective enforcement, a plaintiff must at a minimum establish 'that the challenged decision . . . had a discriminatory effect and that it was motivated by a discriminatory purpose.' " *Polk v. Town of Lubec*, 2000 ME 152 ¶ 14, 756 A.2d 510, 513 (internal citation omitted). A violation of the equal protection clause requires a showing that the party has "been treated more harshly than" other similarly situation

14

persons. *State of Me., et al. v. Dhuy*, 2003 ME 75, ¶17;  825 A.2d 336, 343.

Perry maintains that even if the ordinance is otherwise valid, the ordinance must fail because its enforcement is discriminatory.  Perry states that originally the ordinance was applicable to five entities, but that the City only applied it to two operations, Perry and another scrap metal recycling facility.  Perry again asserts that the sole purpose of the statute was to force Perry and the other facility to relocate so that the City could redevelop the Bayside area.  The City readily concedes that it wants to relocate Perry's operations as part of their plans to redevelop Bayside, but maintains that the ordinance is valid and is applied to all facilities that fall within the definition of scrap metal recycling facilities.[10]

The record indicates that in 2002, the City believed approximately five operations may fall within the proposed ordinance parameters. R.II at 76, exs. 12-16.  In 2004, the City wrote letters to two facilities that fell within the parameters of the ordinance. R.II 52-53.  The City's director of inspection services and the individual in charge of enforcing the ordinance believes three facilities in the city fall under the ordinance. R.II at 75, p. 19, ll 3-8.  As of June 15, 2005, none of those three facilities had sought or obtained scrap metal licenses. *Id*. at ll. 9-12.  The director indicated that the City was working with all three of the facilities to attempt to bring them into compliance with the ordinance's requirements. *Id*. at pp. 19-23.

The facts contained in the record do not support the proposition that Perry was singled our or targeted for a discriminatory purpose; thus, Perry has failed to meet its burden demonstrating that it was singled out for discriminatory treatment or selective

---

[10] The court is well aware through extensive news coverage, visible new construction in the area and litigation on other cases that the City of Portland is aggressively pursuing redevelopment of the Bayside neighborhood which is located on the Portland peninsula and within close proximity to the Cumberland County Courthouse.

15

enforcement of the ordinance.

The record clearly indicates and the City concedes that it wants Perry to relocate as part of its plans to redevelop the Bayside area. That, in and of itself, does not provide proof that the City passed an ordinance and then selectively enforced the ordinance to unfairly discriminate against Perry. Perry has not offered evidence that other entities that were bound by the ordinance were treated differently. As of June 2005, the City was actively working with all the facilities that were impacted by the ordinance. There is no evidence in the record that suggests that the City will allow the other facilities to not comply with the ordinance or that Perry is the only operation against which the ordinance is being enforced. Furthermore, as previously noted, there are valid environmental grounds for the ordinance, which provide a legitimate, non-discriminatory, purpose for the ordinance.

## C. DUE PROCESS CLAUSE

Under the due process clause, a municipal ordinance must "bear a reasonable relationship to the public health, safety, morals or general welfare" and "must not be unreasonable, arbitrary or discriminatory." *Danish Health Club*, 562 A.2d at 664-665. Due process requires that the state exercise its police power consistent with the following:

> 1. The *object* of the exercise must be to provide for the public welfare.
>
> 2. The legislative *means* employed must be appropriate to the achievement of the ends sought.
>
> 3. The *manner of exercising* the power must not be unduly arbitrary or capricious." *Id.* at 665 (quotations omitted).
>
> The party seeking to overturn the ordinance bears the burden of establishing "the complete absence of any state of facts which would support the need for the laws enacted by the municipality.

*State v. Rush*, 324 A.2d 748, 753 (Me. 1974).

16

For the same reasons that the ordinance survived the equal protection challenge, the City's ordinance survives a due process analysis. The object of environmental protection is appropriate and furthers the public's welfare. The means employed by the ordinance are calculated to further that goal through environmental testing and remediation.

Notwithstanding the City's ill-fated attempt to require premature compliance by the plaintiff, the City followed appropriate procedure when enacting the ordinance and there is not sufficient evidence to indicate that the ordinance is being enforced in a discriminatory manner.

There exist facts that support the need of the ordinance because of the environmental remediation that is necessary in the Bayside area as demonstrated through environmental testing done by the city. Perry has not met its burden demonstrating that a violation of its due process rights has occurred.

## D. TAKINGS CLAUSE

The Supreme Court recognizes that a regulation "does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not deny an owner economically viable use of his land." *Nollan v. Ca. Coastal Comm'n*, 483 U.S. 825, 834 (1987)(internal citations omitted). The three significant factors in a regulatory takings analysis are: First, the regulations economic impact on the individual; second, the extent of the interference with the individual's investment-backed expectations; and finally, the character of the governmental action. *Daley, et al. v. Comm'r, Dep't of Marine Resources State of Maine*, 1997 ME 183, ¶7; 698 A.2d 1053, 1056 (citing *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224-25 (1986).

A regulation that violates the takings clause requires a taking in the form of a physical occupation of land or regulation that prevents a landowner from any

economically viable use of his land. Here, Perry has not demonstrated that the City ordinance effectuates a physical taking of his land. Further, Perry has not entered evidence concerning the economic impact of the City's ordinance and therefore, is unable to demonstrate that the ordinance deprives him of economically viable use of his property.[11]

## E. COMMERCE CLAUSE

Congress is empowered to regulate interstate commerce and limit the state's ability "to erect barriers against interstate trade." *Lewis v. BT Investment Managers, Inc.* 447 U.S. 27, 35 (1980); U.S. Const. art. I, §8, cl. 3. The commerce clause is implicated when actions "burden interstate commerce or impede its free flow." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994). The commerce clause can be violated by a burden that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

Perry has failed to demonstrate how the City's regulation of scrap metal recycling facilities in any way creates a barrier to or burdens interstate commerce. While the ordinance does impose a financial burden on facilities that recycle scrap metal, the ordinance does not show preference or unduly inhibit any local facilities' ability to compete with out-of-state facilities.

## V. DECISION AND JUDGMENT

The clerk will make the following entry as the Decision and Judgment of the court:

---

[11] During pretrial stages regarding discovery issues, Perry agreed not to pursue an argument that the City's action had an adverse economic impact on it. *See* letter from Perry's attorney dated September 9, 2005.

**A.** The court finds the SMRF ordinance to be constitutional and enforceable.

**B.** The plaintiff is required to comply with the terms and conditions of the SMRF ordinance.

**C.** Judgment is entered for the defendant City of Portland.

**D.** The defendant City of Portland is entitled to its costs pursuant to rule and statute, exclusive of attorneys' fees.

SO ORDERED.

Dated: February 6, 2007

Thomas E. Delahanty II
Justice, Superior Court

STATE OF MAINE                               SUPERIOR COURT
CUMBERLAND, ss.                                                  CIVIL ACTION
                                                                Docket No. CV-04-720

                        ZODI APR -9 P 4: 20

E. PERRY IRON & METAL
CO., INC.,

        Plaintiff,

v.                                              **ORDER ON MOTION FOR STAY**

CITY OF PORTLAND,

        Defendant.


Judgment was entered for defendant on February 6, 2007.[1] The plaintiff filed an appeal and now asks for a stay of the judgment to prohibit enforcement of the City's Scrap Metal Recycling Facilities Ordinance pending a decision on appeal to the Law Court.

Earlier in the case, this court granted a stay pending resolution of the Rule 80B appeal. The court determined that the new ordinance could not be applied to the plaintiff until September 30, 2006. In a later pretrial order, the court approved the agreement of the parties, that if the plaintiff did not prevail, the 90-day period in which it must begin the process of seeking a new license would start to run on the date of the court's decision on Count I; i.e., February 6, 2007.

The primary argument by plaintiff is that, if it prevails on the appeal to the Law Court, the appeal is rendered meaningless and the plaintiff will have been irreparably damaged.

The City objects to a further stay and argues that E. Perry Iron & Metal Co. Inc. has already been operating too long without being in compliance with the ordinance.

---

[1] The court denied plaintiff's post-judgment motion to amend or alter the judgment.

In support of its position, the City argues that plaintiff cannot meet the legal standard for a stay. It cites *Ingraham v. University of Maine at Orono*, 441 A.2d 691 (Me. 1982) which is Maine's benchmark to obtain a temporary or preliminary injunction.

This four-art test, however, is not applicable to a request for a stay pending appeal. While it may offer guidance for the court's exercise of discretion, its applicability is limited because it is virtually impossible for any party to meet all four parts of the test. The party seeking injunctive relief must show:

1. That it will suffer immediate and irreparable injury; and

2. That the applicant (E. Perry) has a likelihood of success on the merits; and

3. That the public interest will not be adversely affected; and

4. That the injury to the applicant if an injunction is not granted will outweigh any injury to the defendant.

*Ingraham, id.* at 693.

Even if plaintiff could satisfy the points regarding injury and public interest (1, 3 and 4), it is impossible to satisfy the element that it demonstrate a likelihood of success on the merits. If this court believed that the plaintiff was correct and would ultimately prevail on appeal, it would have found in its favor in the first place and the request for a stay would be irrelevant.

When an appeal has been filed, absent specified exceptions, *see*, M.R.Civ.P. 62(a) (e.g., injunction, receivership, custody or support of children, etc.) the default position is that a stay should be granted.

Rule 62(a) provides for automatic stays to the enforcement of judgments during the time to file an appeal and after an appeal has been filed. M.R.Civ.P. 62(e) provides that with certain exceptions not applicable here, "the taking of an appeal from a judgment *shall operate as stay of execution upon the judgment during the pendency of the*

2

*appeal* . . . (emphasis added).  Other portions of Rule 62 clearly indicate that a stay to preserve the status quo is preferred.  *See* M.R.Civ.P. 62(g).

The clerk will make the following entry as the order of the court:

Plaintiff's motion for continuation of stay pending appeal is granted.

In the event that the decision of this court is affirmed, plaintiff shall immediately take all required steps to come into full compliance with the ordinance unless otherwise ordered by the Law Court.

SO ORDERED.

DATED:      April 9, 2007

_____
Thomas E. Delahanty II
Justice, Superior Court

COURTS
d County
x 287
04112-0287


DAVID HIRSHON ESQ
TOMPKINS CLOUGH HIRSHON & LANGER
PO BOX 15060
PORTLAND ME 04112-5060


OF COURTS
erland County
O. Box 287
Maine 04112-0287


PENNY LITTELL ESQ
GARY WOOD ESQ
389 CONGRESS ST
PORTLAND ME 04101